57 P.3d 467

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Tetsuya YAMADA, Defendant–Appellant.**

**No. 22456.**

Supreme Court of Hawai'i.

Nov. 13, 2002.

Reconsideration Denied Dec. 19, 2002.

As Amended Dec. 24, 2002.

Linda C.R. Jameson, Deputy Public Defender, Tetsuya, Yamada, on the briefs, for the defendant-appellant.

Michael S. Kagami, Deputy Prosecuting Attorney, State of Hawai'i, on the briefs, for the plaintiff-appellee.

MOON, C.J., LEVINSON and NAKAYAMA, JJ., and ACOBA, J., concurring separately, and RAMIL, J., dissenting.

Amended opinion of the court by LEVINSON, J.

The defendant-appellant Tetsuya Yamada appeals from the judgment of conviction and

sentence of the third circuit court, the Honorable Greg K. Nakamura presiding, convicting him of two counts of manslaughter, in violation of Hawai'i Revised Statutes (HRS) § 707–702(2) (1993).[1] Yamada argues that the circuit court erred in: (1) instructing the jury on the offense of murder in the first degree, in violation of HRS § 707–701(1)(a) (1993),[2] on the basis that (a) the circuit court did not "instruct the jury that they were to find all of the elements of the charged offense beyond a reasonable doubt before they reach[ed] the insanity defense[,]" (b) the circuit court separated a single charge of murder in the first degree into two charges of manslaughter, and (c) the instruction was "extremely complicated, unnecessarily lengthy and confusing to read"; (2) submitting two separate verdict forms to the jury as to the offense of manslaughter under Count I of the complaint; (3) sentencing Yamada for two offenses of manslaughter under Count I of the complaint; and (4) disallowing as evidence the audio portion of a videotaped "reenactment" of Yamada's role in the killings, as he recalled it, upon which an expert witness relied in assessing Yamada's sanity.

 As discussed more fully *infra* in section III, we hold: (1) that the circuit

court's jury instructions regarding Count I of the complaint were plainly erroneous [3] in that they deprived Yamada of his constitutional right to a unanimous verdict; (2) that HRS § 707–702(2) does not, in a prosecution for first degree murder predicated upon an alleged violation of HRS § 707–701(1)(a), permit multiple manslaughter convictions, as a function of the number of victims, in the event that the jury finds that the prosecution has failed to carry its burden of proving beyond a reasonable doubt that the defendant, at the time that he or she caused the deaths, was not under the influence of extreme mental or emotional distress (EMED); and (3) that Hawai'i Rules of Evidence (HRE) Rule 803(b)(4) (1993) [4] excepts statements made for the purpose of diagnosis, if reasonably pertinent to diagnosis, from the general rule against hearsay, even made to a physician who is consulted for the sole purpose of facilitating the physician's testimony as a witness at trial.[5] Accordingly, we vacate the circuit court's judgment and sentence and remand the case for further proceedings consistent with this opinion.

## I. BACKGROUND

On October 1, 1996, Yamada was charged by complaint with murdering his ex-wife,

---

1. HRS § 707–702(2) provides:
 In a prosecution for murder in the first and second degrees it is a defense, which reduces the offense to manslaughter, that the defendant was, at the time he caused the death of the other person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. The reasonableness of the explanation shall be determined from the viewpoint of a person in the defendant's situation under the circumstances as he believed them to be.

2. HRS § 707–701(1)(a) provides: "A person commits the offense of murder in the first degree if the person intentionally or knowingly causes the death of ... [m]ore than one person in the same or separate incident[.]"

3. Justice Acoba's assertion that "the majority ... has adopted [his] position that the [circuit] court's Special Instruction No. 1 was erroneous" is puerile. But he is perfectly entitled to "set out [his] position in detail."

4. HRE Rule 803(b)(4) excepts from the rule against hearsay, even though the declarant is available as a witness, "[s]tatements made for

purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

5. Although we agree with Yamada that the circuit court's Special Instruction No. 1 could have misled the jury into returning a verdict of not guilty because of a physical or mental disease, disorder or defect excluding criminal responsibility without first finding beyond a reasonable doubt that the prosecution had proved all of the elements of first degree murder, the error was harmless, inasmuch as the jury did not return such a verdict. We emphasize, however, that the trial court must clearly instruct the jury that it may consider a properly raised defense of physical or mental disease, disorder, or defect if and only if it first unanimously agrees that the prosecution has proved all of the elements of the charged offense beyond a reasonable doubt. *See State v. Miyashiro*, 90 Hawai'i 489, 500–01 & n. 13, 979 P.2d 85, 96–97 & n. 13 (App.1999).

Carla Russell, and her daughter, Rachel De-Cambra, on September 29, 1996, with a shotgun. Count I charged Yamada with murder in the first degree, in violation of HRS § 707–701, see supra note 2; counts II and III each charged him with murder in the second degree, in violation of HRS § 707–701.5 (1993);[6] count IV charged him with carrying or use of a firearm in the commission of a separate felony, in violation of HRS § 134–6(a) (1993);[7] and count V charged him with burglary in the first degree, in violation of HRS § 708–810(1)(a) (1993).[8]

At trial, Yamada did not dispute the fact that he had caused the victims' deaths; rather, he maintained that, "at the time he committed this act, he suffered from a physical or mental disorder which substantially impaired his ability to either appreciate the wrongfulness of his conduct or to control his actions to the requirement of the law." Yamada adduced evidence that, beginning in 1959, he had suffered a series of debilitating accidents that caused brain damage resulting in memory loss and blackouts. Harold Hall, Ph.D., an expert in the fields of clinical, forensic, and neuropsychology, testified, based on his interviews with Yamada, his review of Yamada's medical records, interviews with persons who were acquainted with Yamada, and Yamada's reenactment of the events of September 29, 1996 as he recalled them, that "because of deteriorating brain condition triggered by the massive stress reaction there was a substantial impairment in [Yamada's] cognitive and volitional ... capacities" on that date. Consequently, in Dr. Hall's opinion, Yamada was, as a result of a mental disorder, disease, or defect, substantially impaired in his capacity to appreciate the wrongfulness of his conduct and to

conform his actions to the requirements of the law.

At the time of the incident, Yamada was living with his third wife, Puanani Haili, in the Waikea Uka area near Hilo, on a large property containing a number of houses, including that in which his ex-wife, Carla Russell, her daughter, Rachel DeCambra, and DeCambra's boyfriend lived. There was considerable conflict between the Yamada and Russell households at the time of the homicides, including a dispute over who owned the house in which Russell lived; indeed, a mutual TRO governing the conduct of the Yamadas, on the one hand, and Russell and her daughter, on the other, had been issued.

Yamada did not testify at trial, but Detective Edwin Tanaka of Hawai'i County Police Department testified that, in the course of the Mirandized statement that Yamada gave him on the day of the incident, Yamada had claimed that he had been sitting on the porch of his house earlier in the day when he had heard Russell and DeCambra laughingly deriding him and his wife with ethnic slurs. Yamada claimed to have become angry and to have proceeded to his warehouse to retrieve his shotgun and birdshot. Yamada represented to Detective Tanaka that his last recollection prior to killing Russell and DeCambra was walking towards their house, although he did not recall loading the shotgun. Following the deaths, Yamada recalled hearing the telephone ring inside Russell's house, where he discovered Russell's and DeCambra's bodies.

In support of Dr. Hall's testimony regarding mental disease, disorder, or defect, Yamada sought, pursuant to HRE Rule 803(b)(4), see supra note 4, and HRE Rule 703 (1993), see infra note 11, to introduce a forty-two-minute videotape of Yamada's "reenactment" of the events of September 29,

6. HRS § 707–701.5(1) provides that, "[e]xcept as provided in [HRS § ] 707–701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person."

7. HRS § 134–6(a) provides:
It shall be unlawful for a person to knowingly carry on the person or have within the person's immediate control or intentionally use or threaten to use a firearm while engaged in the commission of a separate felony, whether the firearm was loaded or not, and whether operable or not[.]

The prosecution amended the complaint on October 3, 1996, in respects not relevant to the present appeal, and the circuit court subsequently dismissed Count IV of the complaint on the prosecution's motion.

8. HRS § 708–810(1)(a) provides:
A person commits the offense of burglary in the first degree if the person intentionally enters or remains unlawfully in a building, with intent to commit therein a crime against a person or against property rights, and:
... The person is armed with a dangerous instrument in the course of committing the offense....

1996, as he recalled them, into evidence. Dr. Hall had instructed Yamada to "go through the sequence involved in the incident ... in [the] exact way as he recall[ed] it ... from his memory, not from what people told him or what he concluded." Dr. Hall testified that the "reenactment" was conducted to aid him in diagnosing Yamada and preparing for trial, and not for purposes of treatment. In addition, he testified that such "reenactments" were "good practice" in the field of forensic psychology.

The circuit court granted Yamada's motion for a jury viewing of the videotape in part and denied it in part. Specifically, the circuit court permitted Yamada to play the videotape for the jury without the audio component. The circuit court ruled that the videotape did not qualify as an exception to the rule against hearsay pursuant to HRE Rule 803(b)(4), but that, even if it did, "the sound should still not be allowed under [HRE] Rule 403." The circuit court was concerned that, "[i]f the videotape is played with sound then the defendant's statement would be the equivalent of testimony ... not under oath and not subject to cross-examination." The circuit court elaborated upon its ruling as follows:

> The danger of allowing the videotape played with sound is that the jury would consider defendant's statements heard from the videotape as testimony even though their true probative value is to explain Doctor Hall's testimony. Therefore, it will be my position that the probative value of the videotape with the sound is substantially outweighed by the danger of unfair prejudice, misleading or confusing the jury.
>
> Regarding the admissibility of [Yamada's] statements as supporting the basis for Doctor Hall's opinions by way of, um, simply Doctor Hall's testimony, you—Doctor Hall would be able to testify as to those statements provided that—that the proper

*Tabieros v. Clark Equipment Co.*, 85 Hawai'i 336, 944 P.2d 1279 (1997), foundation is laid.

Further, regarding the showing of the videotape without sound, if the portions of the videotape shown merely show defendant's conduct not intended as assertions, those ... portions would not be considered hearsay. On the other hand nonverbal conduct intended as assertions would be hearsay.

Regarding nonverbal conduct intended as assertions, this would be a close call, but, um, with Doctor Hall explaining what [Yamada's] conduct was intended to be rather than [Yamada] orally stating his perceptions and feelings[,] there is a minimal danger that the jury would consider defendant's conduct as shown in the videotape as testimonial in nature. So I'll ... take the position that Doctor Hall can explain defendant's assertive conduct on the videotape provided also that the proper *Tabieros* foundation is laid.[9]

Accordingly, Yamada played the videotape for the jury without the audio component, while Dr. Hall narrated.

After closing arguments, the circuit court instructed the jury regarding first degree murder, pursuant to HRS § 707–701, *see supra* note 2, second degree murder, pursuant to HRS § 707–701.5, *see supra* note 6, manslaughter, pursuant to HRS § 707–702(2), *see supra* note 1, and first degree burglary, pursuant to HRS § 708–810(1)(a), *see supra* note 8. The circuit court's Special Instruction No. 1. set forth the material elements of first degree murder and directed the jury that it must unanimously decide whether the prosecution had proved all the elements of the offense beyond a reasonable doubt. In addition, Special Instruction No. 1 instructed:

> If you unanimously find that the prosecution has not proven beyond a reasonable

9. Thus, although the circuit court ostensibly excluded the audio component of the videotape on the grounds that its probative value was substantially outweighed by the danger of unfair prejudice, irrespective of its admissibility pursuant to HRE Rule 803(b)(4), it appears from the transcripts that the perceived danger of unfair prejudice was that the jury would consider Yamada's statements as proof of the matters asserted (*i.e.*, as substantive evidence), rather than merely as a basis of Dr. Hall's expert testimony. In other words, the circuit court's conclusion that the audio's probative value was substantially outweighed by the danger of unfair prejudice was inextricably linked with its conclusion that the audio constituted inadmissible hearsay.

doubt all of the material elements of the offense of Murder in the First Degree, then you are to enter a verdict of not guilty of the offense of Murder in the First Degree. Again, your verdict must be unanimous.

If you unanimously find that [Yamada] has proven by a preponderance of the evidence the affirmative defense of physical or mental disease, disorder or defect excluding criminal responsibility in regard to the offense of Murder in the First Degree, then you are to enter a verdict of not guilty because of a physical or mental disease, disorder or defect excluding criminal responsibility. Again, your verdict must be unanimous.

If and only if you unanimously find beyond a reasonable doubt that the prosecution has proven all of the elements of the offense of Murder in the First Degree, and you also unanimously find that ... Yamada has not proven by a preponderance of the evidence the affirmative defense of a physical or mental disease, disorder or defect excluding criminal responsibility, you must then determine whether, at the time he caused the death of Carla Russell and Rachel DeCambra, [Yamada] was under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation....

The Prosecution must prove beyond a reasonable doubt that ... Yamada was not, at the time he caused the deaths of Carla Russell and Rachel DeCambra, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. If you unanimously find that the prosecution has done so, then you must return a verdict of guilty of Murder in the First Degree....

....

*If one or more jurors believes or believe that the prosecution has not proven beyond a reasonable doubt that the Defendant Tetsuya Yamada was not, at the time he caused the death of Carla Russell, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation, then you must return a verdict of guilty of Manslaughter*

*based upon extreme mental or emotional disturbance as to the death of Carla Russell ....*

*If one or more jurors believes or believe that the prosecution has not proven beyond a reasonable doubt that the Defendant Tetsuya Yamada was not, at the time he caused the death of Rachel DeCambra, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation, then you must return a verdict of guilty of Manslaughter based upon extreme mental or emotional disturbance as to the death of Rachel De-Cambra ....*

(Emphases added.) The jury's verdict found Yamada guilty of two separate and distinct manslaughter offenses under Count I and not guilty of first degree burglary as charged in the amended complaint, *see supra* note 7.

## II. *STANDARDS OF REVIEW*

### A. *Statutory Interpretation*

■ We review the circuit court's interpretation of a statute de novo. *State v. Pacheco,* 96 Hawai'i 83, 94, 26 P.3d 572, 583 (2001). Our statutory construction is guided by established rules:

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists....

In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) [ (1993) ]. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One ave-

nue is the use of legislative history as an interpretive tool.

> ... This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it ... to discover its true meaning." HRS § 1-15(2) (1993).

*Id.* at 94-95, 26 P.3d at 583-84 (some citations and internal quotation marks added and some in original) (brackets in original).

*Coon v. City and County of Honolulu,* 98 Hawai'i 233, 245, 47 P.3d 348, 360 (2002).

B. *Jury Instructions*

We review the circuit court's jury instructions to determine whether, "when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent or misleading." *State v. Valentine,* 93 Hawai'i 199, 203, 998 P.2d 479, 483 (2000) (citations and internal quotations signals omitted).

> [E]rroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.
>
> [E]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error may have contributed to conviction. If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside.

*Id.* (citations and internal quotation marks omitted).

*State v. Hironaka,* 99 Hawai'i 198, 204, 53 P.3d 806, 812 (2002) (brackets in original). Moreover,

> Inasmuch as "the ultimate responsibility properly to instruct the jury lies with the [trial] court," if trial or appellate counsel fail to raise an objection to an erroneous jury instruction as to which there is a

reasonable possibility of contribution to the defendant's conviction and which, consequently, cannot be harmless beyond a reasonable doubt, then the instruction, by its very nature, has affected the defendant's substantial rights—to wit, his or her constitutional rights to a trial by an impartial jury and to due process of law—and, therefore, may be recognized as plain error. *Id.* at 205, 998 P.2d at 485 (citations omitted); *see State v. Jenkins,* 93 Hawai'i 87, 101, 997 P.2d 13-27 (2000) ("We may recognize plain error when the error committed affects substantial rights of the defendant.") (Quoting *State v. Cullen,* 86 Hawai'i 1, 8, 946 P.2d 955, 962 (1997)); Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b) (1993) ("Plain error or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."); *see also State v. Haanio,* 94 Hawai'i 405, 414-16, 16 P.3d 246, 255-57 (2001) (distinguishing plain from harmless error in the context of jury instructions regarding included offenses).

*State v. Rapoza,* 95 Hawai'i 321, 326, 22 P.3d 968, 973 (2001) (brackets in original). More specifically,

> With respect to jury instructions, "[i]t is a grave error to submit a [criminal] case to a jury without accurately defining the offense charged and its elements. Accordingly, the jury may not be instructed in a manner that would relieve the prosecution of its burden of proving every element of the offense charged." *State v. Jenkins,* 93 Hawai'i 87, 108, 997 P.2d 13, 34 (2000) (citations and footnote omitted). Further, "where ... the jury has been given instructions on a defense other than an affirmative defense,[ ] but has not been instructed that the prosecution bears the burden of proof beyond a reasonable doubt with respect to negativing that defense, substantial rights of the defendant may be affected and plain error may be noticed." *Raines v. State,* 79 Hawai'i 219, 225, 900 P.2d 1286, 1292 (1995); *see also* HRS § 701-115 (1993).

*State v. Jones,* 96 Hawai'i 161, 168, 29 P.3d 351, 358 (2001) (brackets and ellipsis points in original).

### C. *Admissibility Of Evidence*

The admissibility of evidence requires different standards of review depending on the particular rule of evidence at issue. *State v. Pulse*, 83 Hawai'i 229, 246, 925 P.2d 797, 814 (1996).

> When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard. However, the traditional abuse of discretion standard should be applied in the case of those rules of evidence that require a "judgment call" on the part of the trial court.

*Id.* at 246–47, 925 P.2d at 814–15 (citations omitted).

*State v. Torres*, 85 Hawai'i 417, 421, 945 P.2d 849, 853 (App.1997).

We review the admissibility of evidence pursuant to HRE Rule 803 under the right/wrong standard, because "[t]he requirements of the rules dealing with hearsay are such that application of the particular rules can yield only one correct result." *State v. Moore*, 82 Hawai'i 202, 217, 921 P.2d 122, 137 (1996); *accord State v. Samonte*, 83 Hawai'i 507, 534, 928 P.2d 1, 28 (1996); *State v. Jhun*, 83 Hawai'i 472, 477–78, 927 P.2d 1355, 1360–61 (1996).

> However, a trial court's balancing of the probative value of [hearsay] evidence against the prejudicial effect of such evidence under HRE Rule 403 (1993) is reviewed for abuse of discretion. *See id.* An abuse of discretion occurs when the court "clearly exceeds the bounds of reason or disregards rules or principles of law to the substantial detriment of a party litigant." *State v. Furutani*, 76 Hawai'i 172, 179, 873 P.2d 51, 58 (1994) (citations omitted).

*Torres*, 85 Hawai'i at 421, 945 P.2d at 853 (footnote omitted).

### D. *Plain Error*

" 'We may recognize plain error when the error committed affects substantial rights of the defendant.' " *State v. Jenkins*, 93 Hawai'i 87, 101, 997 P.2d 13, 27 (2000) (quoting *State v. Cullen*, 86 Hawai'i 1, 8, 946 P.2d 955, 962 (1997)). *See also* HRPP Rule 52(b) (1993) ("Plain error or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").

## III. *DISCUSSION*

### A. *The Circuit Court's Special Instruction No. 1 Was Plainly Erroneous In That It Deprived Yamada Of His Constitutional Right To A Unanimous Verdict.*

HRS § 707–702(1) (1993) proscribes the offense of manslaughter, which a person commits if he or she "recklessly cause[s] the death of another person" or "intentionally causes another person to commit suicide." Pursuant to HRS § 707–702(3) (Supp.2001), the offense of "[m]anslaughter is a class A felony," for which the punishment is "an indeterminate term of imprisonment of twenty years without the possibility of suspension of sentence or probation." HRS § 706–659 (1993 & Supp.2001). The prosecution did not charge Yamada with the offense of manslaughter. Rather, the prosecution pursued a two-fold strategy. First, in Count I, it sought to convict Yamada of first degree murder, pursuant to HRS § 707–701(1)(a), *see supra* note 2, and argued to the jury that he had "intentionally or knowingly caus[ed] the death of . . . [m]ore than one person in the same or separate incident." Second, and as a backup position, it charged Yamada in Counts II and III with two separate instances of second degree murder, in violation of HRS § 707–701.5, *see supra* note 5, on the basis that Yamada had, as a result of separate and distinct states of mind, intentionally or knowingly caused Carla Russell's and Rachel DeCambra's deaths, respectively.

However, HRS § 707–702(2), *see supra* note 1, provided Yamada with "a defense [ (singular) ], which[,]" "[i]n a prosecution [ (singular) ] for murder in the first and second degrees . . . ," "reduces the offense [ (singular) ] to manslaughter[.]" *Cf.* HRS § 701–115 (1993) (if the defendant presents evidence of "a fact or set of facts" that constitute a defense and the defense is not an affirmative defense, then "the defendant is entitled to an acquittal if the trier of fact finds that the evidence, when considered in

the light of any contrary prosecution evidence, raises a reasonable doubt as to the defendant's guilt"); *see also* HRS § 702–205 (1993) ("[t]he elements of an offense are such ... (2) attendant circumstances ... as ... [n]egative a defense"); *State v. Jones*, 96 Hawai'i 161, 168 n. 10, 29 P.3d 351, 358 n. 10 (2001) ("An affirmative defense is not one that the prosecution is required to negative as an element of the offense. *See State v. Anderson*, 58 Haw. 479, 484–85, 572 P.2d 159, 163 (1977)."); HRS § 701–114 (1993) ("[e]xcept as otherwise provided in [HRS § ] 701–115, no person may be convicted of an offense unless" the prosecution "prove[s] beyond a reasonable doubt ... [e]ach element of the offense"); *Whiting v. State*, 88 Hawai'i 356, 360–61, 966 P.2d 1082, 1086–87 (1998); *State v. Holbron*, 80 Hawai'i 27, 43, 904 P.2d 912, 928 (1995). Thus, in order to convict Yamada of the offense of first degree murder, the prosecution bore the burden of proving beyond a reasonable doubt, *inter alia*, that Yamada was not under the influence of EMED for which there was a reasonable explanation at the time he caused Russell's and DeCambra's deaths. *See* HRS § 707–702(2), *supra* note 1; *Whiting*, 88 Hawai'i at 359–60, 966 P.2d at 1085–86; *Holbron*, 80 Hawai'i at 43, 904 P.2d at 928.

The jury's verdict (which never reached Counts II and III) convicting Yamada of two separate and distinct manslaughter offenses under the umbrella of Count I, reflects, of necessity, that the prosecution failed to carry the foregoing burden. In other words, pursuant to the circuit court's instructions, most notably Special Instruction No. 1, the jury—or one or more of its members—must have harbored a reasonable doubt with respect to whether Yamada, at the time he intentionally or knowingly caused Russell's and DeCambra's deaths, was under the influence of EMED. *Cf. Whiting*, 88 Hawai'i at 360, 966 P.2d at 1086 (jury's verdict convicting defendant of offense of manslaughter by reason of EMED "established" that "the jury concluded beyond a reasonable doubt that [the defendant] intentionally or knowingly caused [the victim's] death," but that "the prosecution failed to negative [defendant's] EMED defense" and, thus, "that the prosecution failed to prove all the material elements of

the offense of murder in the second degree"). But therein lies the rub. By directing the jury to find Yamada guilty of manslaughter "if one or more jurors believes or believe that the prosecution has not proven beyond a reasonable doubt that" Yamada was not under the influence of EMED for which there is a reasonable explanation, Special Instruction No. 1 potentially allowed a single juror to highjack the proceedings and strong-arm the other eleven panel members into returning a verdict convicting Yamada of manslaughter.

■ " '[T]he right of an accused to a unanimous verdict in a criminal prosecution, tried before a jury in a court of this state, is guaranteed by article I, sections 5 and 14 of the Hawai'i Constitution.' [*State v.*] *Arceo*, 84 Hawai'i 1, 30, 928 P.2d 843, 872 (1996)." *Jones*, 96 Hawai'i at 169, 29 P.3d at 359 (some brackets added and some in original) (footnote omitted). " '[T]he teaching of *Arceo* is that the jury must achieve unanimity as to each material element of a criminal offense before it can find a defendant guilty. The unanimity requirement is an essential part and parcel of the jury's formulation of its guilty verdict[.]' " *State v. Jenkins*, 93 Hawai'i 87, 113, 997 P.2d 13, 39 (2000) (quoting *State v. Tanaka*, 92 Hawai'i 675, 680, 994 P.2d, 607, 612 (App.1999)) (some brackets added and some in original) (emphasis deleted).

The negativing of Yamada's mitigating EMED defense being a material element of the offense of first degree murder, as charged in Count I, *see* HRS § 702–205; *Whiting*, 88 Hawai'i at 360, 966 P.2d at 1086, jury unanimity was a prerequisite to returning *any* verdict in connection with that count. And yet the circuit court's Special Instruction No. 1 expressly directed the jury to convict Yamada of manslaughter if a single juror believed that the prosecution had failed to negative the mitigating defense. In this respect, the circuit court's Special Instruction No. 1 was obviously erroneous. Because it is impossible to determine whether the jury was or was not unanimous with respect to its manslaughter verdicts, and, thus, "there is a reasonable possibility" that the erroneous instruction "contributed to" Yamada's convic-

tions, *see State v. Culkin,* 97 Hawai'i 206, 219, 35 P.3d 233, 246 (2001), Yamada's substantial rights were of necessity substantially affected, and the instruction was prejudicially and plainly erroneous. That being so, and because we have no way of knowing whether the jury unanimously acquitted Yamada of first degree murder, as charged in Count I, there is no alternative but to vacate Yamada's convictions and remand this matter to the circuit court for a new trial as to first degree murder, as charged in Count I, and second degree murder, as charged in Counts II and III. *Cf. State v. Miyashiro,* 90 Hawai'i 489, 499, 979 P.2d 85, 95 (App.1999) ("[I]f the jurors unanimously agreed that all the elements of the charged offense have been proved beyond a reasonable doubt but are unable to reach unanimous agreement as to the affirmative defense ..., no unanimous verdict can be reached as to the charged offense because some jurors would vote for conviction and others for acquittal. In such instance, a mistrial would have to be declared due to the hung jury.").

Although the foregoing disposition is outcome-dispositive of the present appeal, we address two additional points of error raised by Yamada in order to provide the guidance to the circuit court and the parties on remand that would be necessary to avoid further grievous error. *See Culkin,* 97 Hawai'i at 219, 35 P.3d at 246; *State v. Davia,* 87 Hawai'i 249, 252, 953 P.2d 1347, 1350 (1998).

B. *The Plain And Unambiguous Language of HRS § 707–702(2) Does Not, In A Prosecution For First Degree Murder Predicated Upon An Alleged Violation Of HRS § 707–701(1)(a), Permit Multiple Manslaughter Convictions, As A Function Of The Number Of Victims, In The Event The Jury Finds That The Prosecution Has Failed To Carry Its Burden Of Proving Beyond A Reasonable Doubt That The Defendant, At The Time That He Or She Caused The Multiple Deaths, Was Not Under The Influence Of EMED.*

■ The jury's verdict, being derivative of Count I (which charged first degree murder), reflects, of necessity, that Yamada bore but a single intent to commit a single offense. *See, e.g., Whiting,* 88 Hawai'i at 360, 966 P.2d at 1086; *cf. State v. Ganal,* 81 Hawai'i 358, 381, 917 P.2d 370, 393 (1996) (jury's verdict convicting defendant of first degree murder pursuant to HRS § 707–701(1)(a) "necessarily included a finding that [the defendant] possessed a single intent to kill all the specific group of victims named" in the count charging the defendant with first degree murder); *Briones v. State,* 74 Haw. 442, 454–56, 848 P.2d 966, 973–74 (1993) (distinguishing state of mind requisite to first degree murder from that requisite to second degree murder). Thus, the jury's verdict in this matter "absolved" Yamada "from penal liability for [first degree] murder," but found him criminally culpable as if he had committed a class A felony, to wit, as if he had committed the offense of manslaughter proscribed by HRS § 707–702(1).

Be that as it may, the plain and unambiguous language of HRS § 707–702(2) does not, in a prosecution for first degree murder predicated upon an alleged violation of HRS § 707–701(1)(a), permit multiple manslaughter convictions, as a function of the number of victims, in the event the jury finds that the prosecution has failed to carry its burden of proving beyond a reasonable doubt that the defendant, at the time that he or she caused the multiple deaths, was not under the influence of EMED. Rather, HRS § 707–702(2) expressly provides, plainly and unambiguously, that one charged murder offense—be it first or second degree—may be mitigated to one manslaughter conviction: "[i]n a prosecution for murder in the first and second degrees it is a defense, which reduces *the offense* to manslaughter, that the defendant was ... under the influence of extreme mental or emotional disturbance[.]" (Emphasis added.)

■ A "cardinal" canon of statutory construction is that this court "cannot change the language of the statute, supply a want, or enlarge upon it in order to make it suit a certain state of facts." *State v. Dudoit,* 90 Hawai'i 262, 271, 978 P.2d 700, 709 (1999) (quoting *State v. Buch,* 83 Hawai'i 308, 326, 926 P.2d 599, 617 (1996) (Levinson, J., concurring and dissenting) (quoting *State v.*

*Meyer,* 61 Haw. 74, 78, 595 P.2d 288, 291 (1979))). This is because "[w]e do not legislate or make laws." *Dudoit,* 90 Hawai'i at 271, 978 P.2d at 709 (citations omitted). Accordingly, "[e]ven where the [c]ourt is convinced in its own mind that the Legislature really meant and intended something not expressed by the phraseology of the Act, it has no authority to depart from the plain meaning of the language used." *Id.* (citations and emphasis omitted); *see also id.* at 270 n. 8, 978 P.2d at 708 n. 8 ("[A]s Justice Ramil himself [has] aptly observed, as author of this court's opinion in *State v. Richie,* 88 Hawai'i 19, 30, 960 P.2d 1227, 1230 (1998), '[i]t is a cardinal rule of statutory interpretation that, where the terms of a statute are plain, unambiguous and explicit, we are not at liberty to look beyond that language for a different meaning. Instead, our sole duty is to give effect to the statute's plain and obvious meaning.'" (Citations omitted.) (Some brackets added and some in original.)). Because the language of HRS § 707–702(2) is plain and unambiguous, "our *only* duty is to give effect to its plain and obvious meaning," *State v. Ontai,* 84 Hawai'i 56, 59, 929 P.2d 69, 72 (1996) (quoting *State v. Toyomura,* 80 Hawai'i 8, 18, 904 P.2d 893, 903 (quoting *State v. Ramela,* 77 Hawai'i 394, 395, 885 P.2d 1135, 1136 (1994))) (emphasis added), rather than, as the dissent undertakes, to assign a meaning to HRS § 707–702(2) that is satisfactory to it but is unsupported by anything other than its own wistful thinking.

Inexplicably, the dissent asserts that the statute's plain language "provides little assistance" as to whether a *single* first degree murder charge, alleging that the defendant caused the deaths of more than one person, can be bifurcated, by virtue of the prosecution's failure to negate an EMED defense, into *multiple* manslaughter convictions predicated upon the number of people whom the defendant killed. Dissenting opinion at 566–567, 57 P.3d at 491–492. The statute quite expressly provides that it cannot. Inasmuch as the statute's language is plain, clear, and unambiguous, our inquiry regarding its interpretation should be at an end. *See, e.g., State v. Valdivia,* 95 Hawai'i 465, 472, 24 P.3d 661, 668 (2001) (reiterating that this court must give effect to the plain meaning of a statute's unambiguous language and that resort to legislative history is an interpretive tool "[i]n construing an *ambiguous* statute") (emphasis added); *State v. Rauch,* 94 Hawai'i 315, 322–23, 13 P.3d 324, 331–32 (2000) (same); *see also Dudoit,* 90 Hawai'i at 270–71, 978 P.2d at 708–09; *Richie,* 88 Hawai'i at 30, 960 P.2d at 1230; *Ontai,* 84 Hawai'i at 59–60, 929 P.2d at 72–73; *Toyomura,* 80 Hawai'i at 18–19, 904 P.2d at 903–04.

The dissent predicates its belief that the statute's plain language "*does not preclude* multiple convictions of manslaughter" arising out of a single first degree murder charge upon the fiction that, "[w]hile HRS § 707–702(2) operates 'to reduce[ ] the offense to manslaughter,' the statute does not address the *manner* in which such a reduction is executed." Dissenting opinion at 567, 57 P.3d at 492 (emphasis and brackets in original). Thus, in the guise of resolving the "manner" by which a first degree murder charge is "reduced" to "*the offense* [singular] of manslaughter," the dissent turns to "the statutory scheme to ascertain legislative intent" underlying HRS § 707–702(2). The statutory scheme that the dissent finds relevant, however, simply does not support the conclusion that the dissent reaches.

The dissent posits that "[t]he legislature created the offense of 'murder in the first degree[ ]' ... to impose a more severe sentence upon those who kill multiple persons in the same or separate incidents" than those who intentionally or knowingly kill a single person. *Id.* at 567, 57 P.3d at 492. We do not disagree with this proposition. But the dissent then extrapolates from this rather self-evident observation that it is "absurd" not to construe HRS § 707–702(2) in such a fashion as to permit—by some alchemic process of cell division—a *single* charge of first degree murder to bifurcate into *multiple* convictions of the "mitigated" offense of manslaughter due to EMED. *Id.* at 567–568, 57 P.3d at 492–493. With *this* proposition we cannot agree.

HRS § 707–701(1)(a) itself describes but a single offense that presupposes the deaths of multiple victims and does not predicate the severity of the resulting punishment upon

the particular number of persons whom the jury determines the defendant has killed. *See Ganal,* 81 Hawai'i at 381, 917 P.2d at 393; *Briones,* 74 Haw. at 454–56, 848 P.2d at 973–74. Be it two people or twenty, the punishment flowing from a violation of HRS § 707–701(1)(a) does not vary as a function of the number of victims. *See* HRS § 706–656(1) (1993) ("[p]ersons convicted of first degree murder and attempted first degree murder shall be sentenced to life imprisonment without possibility of parole").

The dissent believes that to interpret HRS § 707–702(2) "to preclude more than one conviction of manslaughter due to EMED where a defendant has in fact killed more than one person[ ] would be to construe [the statute] in a manner inconsistent with [the] clear legislative intent [of HRS § 707–701(1)(a) ] to impose a more severe punishment for those found guilty of first degree murder[ ]" than for those found guilty of second degree murder. Dissenting opinion at 567, 57 P.3d at 492 (footnote omitted). One of the many flaws in the foregoing reasoning is that a defendant whose criminal culpability is reduced pursuant to HRS § 707–702(2) has *not* been found guilty of first degree murder. Because HRS § 707–702(2) sets forth a defense that the prosecution must negate beyond a reasonable doubt in order to convict a defendant of first degree murder, its failure to do so acquits the defendant of that offense. As such, the legislature's obvious intent to punish *convicted* first degree murderers more severely than *convicted* second degree murderers is irrelevant to Yamada.

A second flaw in the dissent's terse rationale lies in its disregard of the clear legislative intent underlying HRS § 707–702(2) to sentence defendants convicted of manslaughter due to EMED *more leniently* than those convicted of murder. Indeed, the commentary on HRS § 707–702(2) expressly states that the defense set forth in HRS § 707–702(2) "mitigates" the defendant's culpability due to the fact that, although he or she acted intentionally or knowingly, he or she formulated the requisite state of mind and acted upon it while under the influence of extreme mental or emotional disturbance that caused him or her temporarily to lose self-control,

thereby rendering his or her "state of mind ... less culpable." Commentary on HRS § 707–702(2); *see also Holbron,* 80 Hawai'i at 42, 904 P.2d at 927 (quoting *State v. Pinero,* 70 Haw. 509, at 524, 778 P.2d 704, 714 (1989)); *State v. Matias,* 74 Haw. 197, 204–206, 840 P.2d 374, 378 (1992); *State v. Russo,* 69 Haw. 72, 77–79, 734 P.2d 156, 159–60 (1987).

A third and perhaps the most basic flaw in the dissent's reasoning is that it is grounded in a *non sequitur.* The dissent's conclusory pronouncement that,

> [i]t is inconceivable that successful prosecution of all the elements for murder in the first degree (save negating an EMED defense)[ ] would result in only one conviction for manslaughter when successful prosecution of all the elements for two counts of murder in the second degree (save negating an EMED defense) would result in two convictions for manslaughter[,]

dissenting opinion at 567–568, 57 P.3d at 492–493, simply does not follow from its self-evident observation that HRS § 707–701(1)(a) was designed "to impose a more severe sentence upon those who kill multiple persons in the same or separate incidents." *Id.* at 567, 57 P.3d at 492. At most, the dissent identifies an *anomaly,* which is but one of several embedded in HRS ch. 707, pt. II—the statutory scheme relating to "criminal homicide." For example, pursuant to HRS § 706–656(1) (1993), had Yamada been convicted of first degree murder as charged in Count I, he would have been subject to *one* mandatory sentence of life imprisonment without the possibility of parole. However, had the jury acquitted Yamada of first degree murder but convicted him of the two counts of second degree murder charged in Counts II and III, he would have been subject, pursuant to HRS § 706–656(2) (Supp. 2001), to *two* mandatory sentences of life imprisonment with the possibility of parole, which, pursuant to HRS § 706–668.5 (1993), the sentencing court could impose concurrently or consecutively in its discretion. *See State v. Tauiliili,* 96 Hawai'i 195, 199, 29 P.3d 914, 918 (2001) (citing *State v. Gaylord,* 78 Hawai'i 127, 146, 890 P.2d 1167, 1186–87 (1995)). Moreover, pursuant to HRS § 706–

657 (Supp.2001), had Yamada been convicted of the two counts of second degree murder charged in Counts II and III, had the counts alleged that the murders were "especially heinous, atrocious, or cruel, manifesting exceptional depravity," and had the trier of fact found that the prosecution had proved the same beyond a reasonable doubt, Yamada could have been sentenced to *two consecutive terms* of life imprisonment without the possibility of parole instead of the *one* that he would be serving had he been convicted of first degree murder, as charged in Count I. *See State v. Peralto*, 95 Hawai'i 1, 5, 18 P.3d 203, 207 (2001); *State v. Young*, 93 Hawai'i 224, 234, 236, 999 P.2d 230, 240, 242 (2000); *State v. Janto*, 92 Hawai'i 19, 32–35, 986 P.2d 306, 319–22 (1999). Such a result may be anomalous and in tension with the legislature's intent to "impose more severe sentences" for first degree murder; it is, however, not only *not* "inconceivable," but it is entirely possible and certainly not "absurd."

In the present case, the plain and unambiguous language of HRS § 707–702(2) mitigates the *consequence* of the single offense with which Yamada was charged and which the jury considered—intentionally or knowingly causing the death of more than one person in the same or separate incident—from a single term of life imprisonment without the possibility of parole, *see* HRS § 705–656(1), to a single non-probationable indeterminate twenty-year term of imprisonment, *see* HRS § 706–659 (Supp.2001). In other words, deriving as it does from a single charge of first degree murder, Yamada's culpability under HRS § 707–702(2) cannot fluctuate as a function of the number of people killed any more than it could have had Yamada been convicted of the charged offense. The point is that a person charged with only one offense may be convicted of only one offense. To hold otherwise is to distort the plain meaning of HRS § 707–702(2), not to mention orthodox and elementary principles of statutory construction, and to engage in judicial legislation of the most egregious kind.

Because there is no "absurdity" in giving effect to the plain and unambiguous meaning of HRS § 707–702(2), we hold that the statute precludes multiple manslaughter convictions based on a single count charging first degree murder. If the legislature wishes to amend HRS § 707–702(2) to allow for multiple manslaughter convictions flowing from a charge of first degree murder, pursuant to HRS § 707–701(1)(a), it is free to do so. But because it has not (and, *a fortiori*, had not as of the time Yamada committed the offense at issue), the circuit court plainly erred, as Yamada argues, in submitting two " manslaughter-due-to-extreme-mental-or-emotional-disturbance" verdict forms to the jury and, consequently, in sentencing Yamada for the commission of two manslaughter offenses. Accordingly, we hold that Yamada can be subject to only one manslaughter conviction resulting from a charge of first degree murder pursuant to HRS § 707–701(1)(a).

C. *Statements Made Solely For The Purpose Of Diagnosis, If Reasonably Pertinent To Diagnosis, Are Excepted From The Rule Against Hearsay Pursuant to HRE Rule 803(b)(4).*

Finally, the circuit court incorrectly concluded that Yamada's videotaped reenactment did not qualify, pursuant to HRE Rule 803(b)(4), as an exception to the rule against hearsay,[10] on the basis that it was not made for the purpose of treatment. HRE Rule 803(b)(4) excepts from the general prohibition against hearsay, statements made "for purposes of medical diagnosis *or* treatment ... insofar as reasonably pertinent to diagnosis *or* treatment." (Emphases added.) Thus, by its plain language, HRE Rule 803(b)(4) permits, contrary to the circuit court's belief, the admission of statements made solely for the purpose of diagnosis, insofar as reasonably pertinent to diagnosis, even if made in anticipation of litigation.

---

10. "[A] statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted[,]" HRE Rule 801 (1993), "is not admissible except as provided by [the HRE], or by other rules proscribed by the Hawaii supreme court, or by statute." HRE Rule 802 (1993).

This exception, which is identical with Fed[eral] R[ule][of] Evid[ence] (FRE) Rule] 803(4), liberalizes the common-law rule that admitted only statements made for the purpose of medical treatment, see, e.g., Cozine v. Hawaiian Catamaran, 49 Haw. 77, 412 P.2d 669 (1966). Statements made for purposes of treatment are admitted "in view of the patient's strong motivation to be truthful." [FRE Rule] 803(4), Advisory Committee's Note. Statements made for diagnostic purposes only, while not similarly motivated, would be recited in any event by a testifying physician under Rule 703.[11] Were these statements not substantively admissible, a limiting instruction would be necessary, and "[t]he distinction thus called for [is] one most unlikely to be made by juries." Advisory Committee's Note, supra. This difficulty is avoided by providing for substantive admissibility of all "reasonably pertinent" statements made for purposes of treatment or diagnosis.

Commentary on HRE Rule 803. See also United States v. Farley, 992 F.2d 1122, 1125 (10th Cir.1993) (recognizing that FRE Rule 803(4) " 'abolished the [common-law] distinction between the doctor who is consulted for the purpose of treatment and an examination for the purpose of diagnosis only; the latter usually refers to a doctor who is consulted only in order to testify as a witness.' " (quoting Morgan v. Foretich, 846 F.2d 941, 950 (4th Cir.1988) (quoting United States v. Iron Shell, 633 F.2d 77, 83 (8th Cir.1980), cert. denied, 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981)))); Gong v. Hirsch, 913 F.2d 1269, 1273–74 (7th Cir.1990) (recognizing the foregoing).

Accordingly, Yamada's videotaped reenactment of his role in the events of September 29, 1996, upon which Dr. Hall relied for the purpose of diagnosing Yamada and which he testified was "good practice" in the field of forensic psychology, qualified as an exception to the rule against hearsay, pursuant to HRE Rule 803(b)(4).

Of course, the fact that evidence qualifies as an exception to the rule against hearsay pursuant to HRE Rule 803(b)(4) does not preclude the trial court from excluding the evidence, or a portion thereof, pursuant to HRE Rule 403, assuming that the trial court properly weighs the evidence's probative value against the danger of unfair prejudice. We express no opinion regarding the circuit court's HRE Rule 403 balancing in the present matter, however, because it appears from the transcripts that the circuit court's conclusion that the audio's probative value was substantially outweighed by the danger of unfair prejudice was inextricably intertwined with its misunderstanding of HRE Rules 703 and 803(b)(4), see supra notes 9 and 11. Therefore, we believe that it is prudent to allow the circuit court to reconsider the matter in light of our clarification of HRE Rules 703, 705, and 803(b)(4) in the present opinion.

## IV. CONCLUSION

In light of the foregoing, we vacate the circuit court's judgment of conviction and

11. HRE Rule 703 provides:
 The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court may, however, disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.
In addition, HRE Rule 705 provides:
 The expert may testify in terms of opinion or inference and give the expert's reasons therefor without disclosing the underlying facts or data if the underlying facts or data have been disclosed in discovery proceedings. The expert may in any event be required to disclose the underlying facts or data on cross-examination.
Thus, HRE Rules 703 and 705 do not address the admissibility of evidence per se, as both Yamada and the circuit court apparently believed, but merely permit an expert witness to reveal
 the contents of the materials upon which he or she has reasonably relied—hearsay though they may be—in order to explain the basis of his or her opinion, provided, of course, that (1) the expert has actually relied on the material as a basis of the opinion, (2) the materials are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject," and (3) the materials do not otherwise "indicate lack of trustworthiness."
Tabieros, 85 Hawai'i at 384, 944 P.2d at 1327.

sentence, filed on April 12, 1999, and remand the case for further proceedings consistent with this opinion.

### Concurring Opinion of ACOBA, J.

Inasmuch as the majority agrees with and has adopted my position that the court's Special Instruction No. 1 was erroneous, I set out my position in detail. The judgment entered herein should be vacated and remanded for a new trial because the instructions given by the third circuit court (the court) as to (1) the offenses charged of first degree murder of Carla Russell and Rachel DeCambra in the same incident in Count I of the complaint[1] or, alternatively, second degree murder as separately charged as to each of the aforesaid decedents in Counts II and III,[2] and (2) the affirmative defense of physical or mental disease, disorder, or defect excluding penal responsibility (hereinafter insanity)[3] and the mitigating defense of manslaughter[4] (hereinafter manslaughter) were erroneous. While Defendant Appellant Tetsuya Yamada (Defendant) challenges the instructions as erroneous, insufficient, and misleading, there are other fundamental defects in them that we may notice. *See State v. Culkin*, 97 Hawai'i 206, 214, 35 P.3d 233, 241 (2001) ("Where an erroneous instruction affected the substantial rights of a defendant, ... we may notice the error as 'plain error' and remand for corrective action." (Internal quotation marks and citation omitted.)).

### I.

We review jury instructions by asking " 'whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading.' " *State v. Aganon*, 97 Hawai'i 299, 302, 36 P.3d 1269, 1272 (2001) (quoting *State v. Balanza*, 93 Hawai'i 279, 283, 1 P.3d 281, 285 (2000)). " '[E]rroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.' " Id. (quoting *State v. Sua*, 92 Hawai'i 61, 69, 987 P.2d 959, 967 (1999)). We must consider the claimed error " 'in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error may have contributed to conviction.' " *Id.* (quoting *Sua*, 92 Hawai'i at 69, 987 P.2d at 967).

### II.

In instructing the jury in a criminal case, certain fundamental principles must be fol-

---

1. Hawai'i Revised Statutes (HRS) § 707–701 (1993), in relevant part, provides:

 (1) A person commits the offense of murder in the first degree if the person intentionally or knowingly causes the death of:
 (a) *More than one person in the same or separate incident* [.]
 (Emphasis added.)

2. HRS § 707–701.5(1) (1993) states:

 Except as provided in section 707–701, a person commits the offense of murder in the second degree if the person intentionally or knowingly *causes the death of another person.*
 (Emphasis added.)

3. HRS § 704–400 (1993) provides:

 (1) A person is not responsible, under this Code, for conduct if at the time of the conduct *as a result of physical or mental disease, disorder, or defect the person lacks substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform the person's conduct to the requirements of law.*
 (2) As used in this chapter, the terms "physical or mental disease, disorder, or defect" do not include an abnormality manifested only by

repeated penal or otherwise anti-social conduct.
(Emphasis added.)

4. HRS § 707–702(2) (1993) provides:

 *In a prosecution for murder in the first and second degrees it is a defense, which reduces the offense to manslaughter,* that the defendant was, at the time he caused the death of the other person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. The reasonableness of the explanation shall be determined from the viewpoint of a person in the defendant's situation under the circumstances as he believed them to be.
 (Emphasis added.)
 "The mitigating defense has been characterized as 'voluntary manslaughter' because it involves the intentional or knowing killing of another while under the influence of a reasonably induced extreme mental or emotional disturbance ... causing a temporary loss or normal self control." *State v. Kaiama*, 81 Hawai'i 15, 25 n. 25, 911 P.2d 735, 745 n. 25 (1996) (quoting *State v. Pinero*, 70 Haw. 509, 523–24, 778 P.2d 704, 714 (1989) (citation omitted)) (brackets omitted).

lowed. In *State v. Miyashiro*, 90 Hawai'i 489, 979 P.2d 85 (App.1999), the Intermediate Court of Appeals (ICA) ruled that guilt is an ultimate determination, not an intermediate one, to be made. Therefore, in considering affirmative defenses, jurors must first decide whether the elements of the charged offense have been proved beyond a reasonable doubt before considering evidence regarding an affirmative defense and, if appropriate, the final question of guilt:

> In our view, ... *a defendant's guilt is the ultimate finding that a jury must make after determining whether the defendant has committed all the elements of the offense charged and considering any affirmative defenses raised.* In other words, each juror must individually determine whether all the elements of the offense have been established beyond a reasonable doubt and, if so, whether the defendant has established, by a preponderance of the evidence, the existence of the affirmative defense before determining the ultimate issue of the defendant's guilt.

*Id.* at 499, 979 P.2d at 95 (emphasis added). Second, the ICA explained that, in order for any proper verdict to be rendered, complete unanimity is necessary. *See id.* Finally, *Miyashiro* indicated that the instructions should be given in a sequence consistent with the logical progression of determining acquittal or guilt:

> The circuit court should have instructed the jury, in relevant part, that its delibera-

tive process should include the following steps:

(1) For each count, decide whether all the elements of the charged offense have been established beyond a reasonable doubt.

(2) If the jury unanimously agrees that all the elements of the charged offense have not been established beyond a reasonable doubt, the jury must acquit [the d]efendant of the charged offense and consideration of the affirmative defense ... is not required.

(3) If the jury unanimously agrees that all the elements of the charged offense have been established beyond a reasonable doubt, then the jury must consider the affirmative defense.... In such event,

(a) If the jury unanimously agrees that [the d]efendant has proved, by a preponderance of the evidence, [the affirmative defense] for a charged offense, the jury must acquit [the d]efendant of that offense; and

(b) If the jury unanimously agrees that [the d]efendant has not proved, by a preponderance of the evidence, [the affirmative defense], the jury must find Defendant guilty of the charged offense.

*Id.* at 500 n. 13, 979 P.2d at 96 n. 13. These principles were not adhered to in this case.

### III.

The court's Special Instruction No. 1[5] set forth the elements of first degree murder of

---

**5.** For reading convenience, the instruction is set forth in its entirety herein. As originally given, the instruction at issue, "Court's Special Instruction No. 1," except for the last paragraph, reads as follows:

> In Count I of the Complaint, Defendant Tetsuya Yamada is charged with the offense of Murder in the First Degree.
> A person commits the offense of Murder in the First Degree if he intentionally or knowingly causes the death of more than one person in the same incident.
> There are three material elements of the offense of Murder in the First Degree, each of which the prosecution must prove beyond a reasonable doubt.
> These three elements are:
> 1. On or about September 29, 1996, in the County and State of Hawaii;

> 2. Defendant Tetsuya Yamada intentionally or knowingly caused the deaths of Carla Russell and Rachel DeCambra; and
> 3. Defendant Tetsuya Yamada's state of mind in intentionally or knowingly causing the deaths of Carla Russell and Rachel DeCambra was to cause the deaths of both Carla Russell and Rachel DeCambra in the same incident.
> If you unanimously find that the prosecution has not proven beyond a reasonable doubt all of the material elements of the offense of Murder in the First Degree, then you are to enter a verdict of not guilty of the offense of Murder in the First Degree. Again, your verdict must be unanimous.
> If you unanimously find that Defendant Tetsuya Yamada has proven by a preponderance of the evidence the affirmative defense of physical or mental disease, disorder or defect excluding criminal responsibility in regard to the

two or more persons, that is, for causing the deaths of Carla Russell and Rachel DeCambra, the defenses of insanity and manslaughter as previously mentioned, the order in which the jury was to consider the offense(s) and the defenses, and the possible verdicts

offense of Murder in the First Degree, then you are to enter a verdict of not guilty because of a physical or mental disease, disorder or defect excluding criminal responsibility. Again, your verdict must be unanimous.

If and only if you unanimously find beyond a reasonable doubt that the prosecution has proven all of the elements of the offense of Murder in the First Degree and you also unanimously find that Defendant Tetsuya Yamada has not proven by a preponderance of the evidence the affirmative defense of a physical or mental disease, disorder or defect excluding criminal responsibility, you must then determine whether, at the time he caused the deaths of Carla Russell and Rachel DeCambra, Defendant was under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. The reasonableness of the explanation shall be determined from the viewpoint of a reasonable person in Defendant's situation under the circumstances which Defendant was aware of or as Defendant believed them to be.

The prosecution must prove beyond a reasonable doubt that Defendant Tetsuya Yamada was not, at the time he caused the deaths of Carla Russell and Rachel DeCambra, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. If you unanimously find that the prosecution has done so, then you must return a verdict of guilty of Murder in the First Degree unless one or more jurors has or have determined that Defendant has proven by a preponderance of the evidence the affirmative defense of a physical or mental disease, disorder or defect excluding criminal responsibility.

Remember, that in order to return a verdict of Murder in the First Degree,:

1. You must unanimously find that the prosecution has proven all of the elements of Murder in the First Degree;
2. You must unanimously find that the prosecution has proven beyond a reasonable doubt that Defendant Tetsuya Yamada was not, at the time he caused the deaths of Carla Russell and Rachel DeCambra, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation; and
3. No juror has determined that Defendant has proven by a preponderance of the evidence the affirmative defense of a physical or mental disease, disorder or defect excluding criminal responsibility.

If one or more jurors believes or believe that the prosecution has not proven beyond a reasonable doubt that the Defendant Tetsuya Yamada was not, at the time he caused the death of Carla Russell, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation, then you must return a verdict of guilty of Manslaughter based upon extreme mental or emotional disturbance as to the death of Carla Russell unless one or more jurors has or have determined that Defendant has proven by a preponderance of the evidence the affirmative defense of a physical or mental disease, disorder or defect excluding criminal responsibility. Remember[,] you may not find Defendant guilty of Manslaughter as to the death of Carla Russell if one or more jurors has or have determined that Defendant has proven by a preponderance of the evidence the affirmative defense of a physical or mental disease, disorder or defect excluding criminal responsibility.

If one or more jurors believes or believe that the prosecution has not proven beyond a reasonable doubt that Defendant Tetsuya Yamada was not, at the time he caused the death of Rachel DeCambra, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation, then you must return a verdict of guilty of Manslaughter based upon extreme mental or emotional disturbance as to the death of Rachel DeCambra unless one or more jurors has or have determined that Defendant has proven by a preponderance of the evidence the affirmative defense of a physical or mental disease, disorder or defect excluding criminal responsibility.

At some point after the court read all the instructions to the jury, and the jurors had initiated their deliberations, the prosecution contended that the last paragraph of Court's Special Instruction No. 1, not reproduced here, was confusing. The court proposed two paragraphs, which were acceptable to both the prosecution and the defense, that were read to the jurors. These two paragraphs, given in addition to the paragraphs reproduced *supra*, were as follows:

If: (1) you have determined that Defendant Tetsuya Yamada is guilty of an offense under Count I of the Complaintl [sic]; or (2) you have determined that Defendant is not guilty of an offense under Count I of the Complaint because he has proven *the affirmative defense of physical or mental disease, disorder or defect excluding criminal responsibility, then you are not to consider Counts II and III of the Complaint.*

If: (1) you have determined that Defendant Tetsuya Yamada is not guilty of the offense of Murder in the First Degree under Count I of the Complaint; or (2) you cannot reach a unanimous verdict as to Murder in the First Degree under Count I of the Complaint, then you are to consider Counts II and III of the Complaint.

(Emphasis added.)

the jury might render. It was prejudicial insofar as it: (1) failed to clearly inform the jurors that they were to consider the affirmative defense of insanity only if they first decided the prosecution had proved all the elements of murder in the first degree; (2) suggested that the jurors were to consider the insanity defense *after* addressing the manslaughter question; and (3) incorrectly advised the jurors that they could return a verdict of manslaughter without a unanimous verdict as to that defense. The court also incorrectly instructed the jury with regard to when it was to consider Counts II (second degree murder for causing the death of Carla Russell) and III (second degree murder for causing the death of Rachel DeCambra) of the complaint. Insofar as Counts II and III incorporate similar phrasing and the order of directions that are contained in Count I, they would be similarly defective.

### IV.

### A.

Court's Special Instruction No. 1 was inconsistent and misleading. The court failed to advise the jurors that they were to consider the affirmative defense of insanity *only* if they first unanimously found the prosecution had proved all the elements of first degree murder. The court's instructions in this regard stated:

. If you unanimously find that the prosecution has not proven beyond a reasonable doubt all of the material elements of the offense of Murder in the First Degree, then you are to enter a verdict of not guilty of the offense of Murder in the First Degree. Again, your verdict must be unanimous.

If you unanimously find that Defendant Tetsuya Yamada has proven by a preponderance of the evidence the affirmative defense of physical or mental disease, disorder or defect excluding criminal responsibility in regard to the offense of Murder in the First Degree, then you are to enter a verdict of not guilty because of a physical or mental disease, disorder or defect excluding criminal responsibility. Again, your verdict must be unanimous.

Contrary to *Miyashiro*, nowhere in the instructions did the court expressly inform the jurors that they were to consider insanity only *after* having unanimously concluded that the prosecution had proven all the elements of murder in the first degree. *Cf. State v. Williams*, 25 Conn.App. 456, 595 A.2d 895, 898 (1991.) (upholding use of jury instruction that advised the jury that it is to consider a defense only after it first found that prosecution proved all the elements of murder beyond a reasonable doubt), *cert. denied*, 220 Conn. 916, 597 A.2d 339 (1991).

### B.

Early in its instructions, the court indicated that the jurors were to consider the manslaughter defense after unanimously deciding there was proof of the first degree murder elements and not a preponderance of evidence as to the insanity defense:

If and only if you unanimously find beyond a reasonable doubt that the prosecution has proven all the elements of the offense of Murder in the First Degree and you also unanimously find that Defendant Tetsuya Yamada has not proven by a preponderance of the evidence the affirmative defense of a physical or mental ' disease, disorder or defect excluding criminal responsibility, you must then determine whether, at the time he caused the deaths of Carla Russell and Rachel DeCambra, Defendant was under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation . . . .

However, the instruction later implied that the jurors should consider the insanity issue after the manslaughter defense:

Remember, that in order to return a verdict of Murder in the First Degree,:

1. You must unanimously find that the prosecution has proven all of the elements of Murder in the First Degree;

2. You must unanimously find that the prosecution has proven beyond a reasonable doubt that Defendant Tetsuya Yamada was not, at the time he caused the deaths of Carla Russell and Rachel DeCambra, un-

der the influence of extreme mental or emotional disturbance for which there is a reasonable explanation; and

3. *No juror has determined that Defendant has proven by a preponderance of the evidence the affirmative defense of a physical or mental disease, disorder or defect excluding criminal responsibility.*

(Emphasis added.) Again, later in the instructions, the court repeated this suggestion:

If one or more jurors believes or believe that the prosecution has not proven beyond a reasonable doubt that the Defendant Tetsuya Yamada was not, at the time he caused the death of Carla Russell, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation, then you must return a verdict of guilty of Manslaughter based upon extreme mental or emotional disturbance as to the death of Carla Russell *unless one or more jurors has or have determined that Defendant has proven by a preponderance of the evidence the affirmative defense of a physical or mental disease, disorder or defect excluding criminal responsibility. . . .*

If one or more jurors believes or believe that the prosecution has not proven beyond a reasonable doubt that Defendant Tetsuya Yamada was not, at the time he caused the death of Rachel DeCambra, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation, then you must return a verdict of guilty of Manslaughter based upon extreme mental or emotional disturbance as to the death of Rachel DeCambra *unless one or more jurors has or have determined that Defendant has proven by a preponderance of the evidence the affirmative defense of a physical or mental disease, disorder or defect excluding criminal responsibility.*

(Emphases added.) The court's instruction thus indicated that the jury was to consider the insanity defense *after* addressing the manslaughter question.

Of course, the jury was required to decide the insanity defense, which would exclude responsibility for first degree murder, before proceeding to consider the mitigating defense of manslaughter, inasmuch as the manslaughter defense is premised on the subsistence of the murder charge and, at least, some criminal responsibility for the actions for which the defendant was charged. Court's Special Instruction No. 1 was therefore internally misleading. In light of the instruction, the jury could have considered the manslaughter defense before addressing the insanity question. *Cf. People v. Johns,* 122 A.D.2d 74, 504 N.Y.S.2d 485, 486 (N.Y.App.Div.1986) (inasmuch as the trial court's instructions suggested that the jury not consider the insanity defense if it determined that defendant had proved the manslaughter defense, "[t]he charge ... created the misleading impression that the insanity defense did not apply if the jury found that defendant satisfied his burden of proving that he was acting while under the influence of an extreme emotional disturbance" and that such instruction "impermissibly curtailed the jury's consideration of the insanity defense").

## V.

### A.

Most egregious, however, is that Court's Special Instruction No. 1 erroneously advised the jurors that they could return a verdict on manslaughter without unanimously agreeing to such a verdict.[6] To properly instruct the jury that it could render such a verdict, the court was required to inform the jury that it must unanimously agree the prosecution had failed to disprove the manslaughter defense beyond a reasonable doubt. The court never so instructed the jury. Rather, the court informed the jury as follows:

*If one or more jurors believes or believe that the prosecution has not proven beyond a reasonable doubt that the Defen-*

---

**6.** This error was also made with regard to the court's instructions on the manslaughter defense

as applied to Counts II and III.

*dant Tetsuya Yamada was not, at the time he caused the death of Carla Russell, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation, then you must return a verdict of guilty of Manslaughter based upon extreme mental or emotional disturbance as to the death of Carla Russell* unless one or more jurors has or have determined that Defendant has proven by a preponderance of the evidence the affirmative defense of a physical or mental disease, disorder, or defect excluding criminal responsibility. . . .

*If one or more jurors believes or believe that the prosecution has not proven beyond a reasonable doubt that the Defendant Tetsuya Yamada was not, at the time he caused the death of Rachel DeCambra, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation, then you must return a verdict of guilty of Manslaughter based upon extreme mental or emotional disturbance as to the death of Rachel DeCambra* unless one or more jurors has or have determined that Defendant has proven by a preponderance of the evidence the affirmative defense of a physical or mental disease, disorder or defect excluding criminal responsibility.

(Emphases added.) The circumstance the court described in instructing the jury to return a verdict of manslaughter was one in which the jury could have convicted Defendant of manslaughter without a unanimous decision. In such a case, the jury should have been hung, entitling Defendant to a mistrial.[7] The Hawai'i Pattern Jury Instructions—Criminal (HAWJIC) correctly applies the unanimity principles to the manslaughter defense as follows:

The prosecution must prove beyond a reasonable doubt that the defendant was not, at the time that he/she caused the death of *(decedent),* under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. If you unanimously find that the prosecution has done so, then you must return a verdict of guilty of *(specify murder charge).* If you unanimously find that the prosecution has not done so, then you must return a verdict of guilty of Manslaughter based upon extreme mental or emotional disturbance.

*If you are unable to reach a unanimous agreement as to whether the prosecution has proved, or failed to prove, that the defendant was not under the influence of extreme mental or emotional disturbance, then your decision is not unanimous and a verdict may not be returned on this offense.*

HAWJIC 9.08 (Underscoring in original.) (Italicized emphasis added.)

### B.

Criminal defendants are entitled to a unanimous verdict under the Hawai'i Constitution and pursuant to court rule. *See State v. Arceo,* 84 Hawai'i 1, 30, 928 P.2d 843, 872 (1996) ("[W]e . . . hold that the right of an accused to a unanimous verdict in a criminal prosecution, tried before a jury in a court of this state, is guaranteed by article I, sections 5 and 14 of the Hawai'i Constitution."[8] (Citation omitted.)); *State v. Jones,* 97 Hawai'i 23, 29, 32 P.3d 1097, 1103 (App.1998) ("Defendant may only be convicted by a unanimous verdict[.]"); Hawai'i Rules of Penal Procedure Rule 31(a) ("The verdict shall be unanimous, unless otherwise stipulated to by the parties."). By instructing the jury that they could return a manslaughter verdict without a unanimous vote, the court violated Defendant's constitutional right to a unanimous verdict. Accordingly, there is a rea-

---

7. At best, the specific statement that the jury was to return a verdict of manslaughter, if one or more jurors believed the prosecution failed to disprove that defense, created a misleading and inconsistent directive in light of the court's giving of a general unanimity instruction, broadly instructing the jury that "[its] verdict must be unanimous."

8. Article I, section 5 of the state constitution reads, in part, "No person shall be deprived of life, liberty, or property without due process of law[.]" Meanwhile, article I, section 7 states in part that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury. . . . Juries, where the crime charged is serious, shall consist of twelve persons."

sonable possibility that the wording of the court's Special Instruction No. 1 may have contributed to Defendant's conviction.

## VI.

The court also erroneously instructed as to the circumstances necessary to proceed to Counts II and III. Guilt is an ultimate determination to be made by the jury. *See Miyashiro,* 90 Hawai'i at 499, 979 P.2d at 95 ("[A] defendant's guilt is the ultimate finding that a jury must make after determining whether the defendant has committed all the elements of the offense charged and considering any affirmative defenses raised.") The final two paragraphs of the court's Special Instruction No. 1 employ "guilty" and "not guilty" in an imprecise way, thus generating directions for the jury that are inconsistent and misleading:

If: (1) you have determined that Defendant Tetsuya Yamada is guilty of an offense under Count I of the Complaint1 [sic]; or (2) you have determined that Defendant is not guilty of an offense under Count I of the Complaint because he has proven *the affirmative defense of physical or mental disease, disorder or defect excluding criminal responsibility, then you are not to consider Counts II and III of the Complaint.*

If: (1) you have determined that Defendant Tetsuya Yamada is *not guilty of the offense of Murder in the First Degree* under Count I of the Complaint; or (2) you cannot reach a unanimous verdict as to Murder in the First Degree under Count I of the Complaint, then you are to consider Counts II and III of the Complaint.

(Emphases added.)

On the one hand, in the first paragraph above, the instruction advises the jury *not* to consider Counts II and III if it determines Defendant is not guilty of Count I due to insanity. ("If . . . you have determined that Defendant is not guilty of . . . Count I . . . because he has proven [insanity], then you are not to consider Counts II and III of the Complaint."). On the other hand, in the second paragraph above, the instruction informs the jury it *is* to consider Counts II and III if it determines that Defendant is not guilty of first degree murder. ("If . . . you

have determined that Defendant . . . is not guilty of the offense of Murder in the First Degree[,] . . . then you are to consider Counts II and III.").

With regard to the latter instruction, the court does not clarify, as it apparently means, that "not guilty" in that instance means not guilty due to the prosecution's failure to prove the elements of murder in the first degree, and not because Defendant was found insane, thus excluding penal responsibility. Inasmuch as the instruction advises that the jurors are not to consider Counts II and III if they find Defendant not guilty by reason of insanity, but also suggests that they are to consider Counts II and III if they find Defendant not guilty generally (which would include a finding of not guilty by reason of insanity), the instruction is inconsistent and misleading.

Also, in informing the jury that if it "cannot reach a *unanimous verdict* as to Murder in the First Degree[,]" it "[is] to consider Counts II and III of the Complaint[,]" (emphasis added) the court incorrectly permitted the jury to consider Counts II and III, even in the event the jury found the murder first degree elements established beyond a reasonable doubt but could not reach a unanimous verdict on whether Defendant proved insanity or on whether the prosecution disproved manslaughter. In such circumstances, the jury should not be allowed to consider Counts II and III. Moreover, a jury that is hung on either insanity or manslaughter with regard to Count I would, in all likelihood, be similarly hung on either defense with regard to Counts II and III, rendering consideration of those counts inconsequential.

## VII.

I believe that the court should have instructed the jury in a manner consistent with principles announced in *Miyashiro.* Instructions should have been given in the instant case in the following order. The court should have advised the jury that it was to first consider whether the prosecution proved each of the elements of murder in the first degree. If the jurors unanimously

564

found that the prosecution did not prove the elements of first degree murder, they were to return a verdict of not guilty as to Count I, and were then to consider Counts II and III. If they were not unanimous as to whether the prosecution proved the elements beyond a reasonable doubt, then they were to consider Counts II and III. If they unanimously agreed that the prosecution proved murder in the first degree, the jurors were then to address Defendant's insanity claim.

The court should have then instructed the jurors as to the burdens with regard to the insanity defense and explained that, if the jury was unanimous in deciding that Defendant proved insanity, it should return a verdict of not guilty on the ground of physical or mental disease, disorder, or defect excluding responsibility. *See* HRS § 704–402(3) (1993). If the jury unanimously agreed that Defendant failed to prove insanity, the court should then direct the jury to consider the defense of manslaughter.[9]

With regard to the manslaughter defense, the jury should have been advised of the burdens with regard to that mitigating defense. If it unanimously agreed that the prosecution disproved the defense, the court should then advise the jury it was to return a verdict of guilty of first degree murder. If the jurors unanimously agreed that the prosecution did not disprove the defense, they were to return an appropriate manslaughter disposition.[10]

In the event they reached Counts II and III, the jurors should have been instructed in the same manner with respect to Count I as to the consideration of defenses, burdens of proof, and proper verdicts under each of Counts II and III.

## VIII.

For the foregoing reasons, the case must be vacated and remanded for a new trial, with instructions to the court to properly instruct the jury in accordance with the foregoing precepts.

Dissenting Opinion by RAMIL, J.

I dissent from the majority's conclusion that Yamada was denied his constitutional right to a unanimous jury verdict because any error by the court in its special jury instruction number 1 was harmless. I also dissent from the majority's reasoning that mitigation of murder in the first degree, a crime that involves "intentionally or knowingly" causing the death of "[m]ore than one person in the same or separate incident," HRS § 707–701(1)(a), results in a single conviction of manslaughter due to extreme mental or emotional disturbance ("EMED").

### A. Harmless Error Regarding the Court's Special Jury Instruction Number 1

I begin by explaining that the issue whether unanimity is required to convict of manslaughter due to EMED was not an issue brought on appeal. In Yamada's opening brief, he asserts the following five points of error: (1) the trial court's special instruction number 1 was patently defective, prejudicially flawed, and erroneous; (2) the trial court's response to the jury regarding whether unanimity was required on the insanity defense was insufficient and misleading; (3) the trial court erred by submitting two verdict forms on manslaughter; (4) the trial court erred by sentencing Yamada to two manslaughter convictions; and (5) the trial court abused its discretion when it allowed the defense to play the videotaped reenactment of the incident for the jury, but disallowed the jury to hear the sound. In his first contention that the jury instructions were prejudicially insufficient, erroneous, inconsistent, and misleading, Yamada argued the following: (a) that the trial court erroneously instructed the jury to proceed to counts II and III (charging second degree murder) if they were unable to reach a unanimous verdict on count I (first degree murder);[1] (b) that the trial

---

9. If the jury could not reach a decision on the question of insanity, it would so inform the court and the court should then declare the jury hung.

10. Again, if the jurors could not reach an appropriate manslaughter disposition, they would so

inform the court. In such a situation, the court should then declare the jury hung.

1. The jurors reached a verdict under count I of the complaint and did not proceed to counts II and III. Accordingly, Yamada's argument is moot

court failed to instruct the jurors that they must find that the prosecution proved all of the elements of first degree murder before considering the insanity defense;[2] (c) that the trial court's "special jury instruction no. 1" was "exceedingly lengthy, cumbersome, and requires numerous readings;"[3] and (d) that the trial court's response to a jury communication was reversible error.[4] None of Yamada's allegations of error direct the court to consider whether unanimity is required to properly convict of manslaughter due to EMED. Furthermore, I note that Yamada was clearly aware that unanimity could be an issue brought on appeal. In Yamada's second point of error, and in what I have labeled as point of error (1)(d), he argued that the trial court's response to the jury regarding whether unanimity was required on the *insanity* defense was insufficient and misleading. I decline to speculate why Yamada elected not to put forth a similar argument pertaining to the EMED instruction—suffice it to say that he did not, and that the majority therefore examined the issue *sua sponte*.

Because the majority decided to address the issue of unanimity for a conviction of manslaughter due to EMED *sua sponte*, it must apply a "plain error" standard of review. However, the majority paradoxically finds plain error when the record reveals

that the error was harmless. The majority itself recognizes that:

> [E]rroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.

> [E]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that the error may have contributed to conviction.

Majority at 549, 57 P.3d at 474 (citation omitted).

In the present case, the jury verdict form states in relevant part:

> Please answer SPECIAL INTERROGATORY No. 1

> With respect to Count I of the Complaint, did the prosecution prove beyond a reasonable doubt that the Defendant Testuya Yamada used a firearm while engaged in the commission of the offense of MANSLAUGHTER in regard to the death of RACHEL DeCAMBRA?

and can have no effect upon his conviction. *State v. Haanio*, 94 Hawai'i 405, 415–16, 16 P.3d 246, 256–57 (2001); *State v. Holbron*, 80 Hawai'i 27, 47, 904 P.2d 912, 932 (1995).

2. Yamada does not explain how this was error or how it might have impacted the jury's unanimous conclusion that he did not establish the affirmative defense of penal irresponsibility. In any event, when read as a whole, the instructions plainly advise that the jury must determine whether the prosecution has proved all of the elements of first degree murder before considering whether Yamada established the affirmative defense of penal irresponsibility.

3. Inasmuch as it encompassed first degree murder, EMED manslaughter, and the affirmative defense of penal irresponsibility, a somewhat lengthy instruction was necessary to fully inform the jurors regarding the law applicable to the facts. *See Roxas v. Marcos*, 89 Hawai'i 91, 140 n. 32, 969 P.2d 1209, 1259 n. 32 (1998) (citation omitted). Hawai'i case law emphasizes the trial court's duty to ensure that cases go to the jurors in a "clear and intelligent manner, so that they

may have a clear and correct understanding of what it is that they are to decide[.]" *Id.* Much of the length of the jury instruction derived from the trial court's efforts to clarify the law for jurors through repetition and emphasis. As such, contrary to Yamada's assertion, length clarifies rather than obfuscates this instruction.

4. I first note that this argument is the same as Yamada's second point of error, described above. The jury inquired:

> One, do we have to be unanimous in finding defendant not guilty. Two, do we have to be unanimous in finding defendant not guilty as a result of physical, mental disease, disorder or defect excluding criminal responsibility.

The jury instructions quite plainly advised the jury that it did, in fact, have to be unanimous in finding Yamada not guilty, either because the prosecution failed to prove beyond a reasonable doubt the material elements of first degree murder, or because Yamada proved by a preponderance of evidence the affirmative defense of penal irresponsibility. As such, the trial court's response, directing the jurors to follow the jury instructions, was not erroneous.

566

(A "Yes" answer must be unanimous. If you are not unanimous in your answer, then your answer must be "No".)

Yes No

There is an identical jury verdict form in regard to the death of Carla Russell. On both forms, the jury placed a checkmark on the "Yes" line. The verdict forms facially indicated that unanimity was required. Although the jury instructions did not mandate unanimity, the jury nonetheless was unanimous, as demonstrated by its answer to special interrogatory number 1. Accordingly, any error in the jury instructions was necessarily harmless and could not amount to plain error. *See State v. Correa*, 5 Haw.App. 644, 647, 706 P.2d 1321, 1324 (1985) (holding that "[t]he verdict forms cured the deficiency in the court's instruction with respect to counts II and III"); *see also State v. Lord*, 117 Wash.2d 829, 879–80, 822 P.2d 177, 206 (1991) (holding that the special verdict form, when read with the "to convict" instruction for the alternative of first degree murder, cured any problem with the jury instructions because the verdict form properly informed the jury that unanimity was required for each underlying crime in order to convict of felony murder).

B. *Two Convictions of Manslaughter Due to EMED*

Yamada's primary contention on appeal relates to the fact that he was charged with one count of first degree murder,[5] yet convicted of two counts of manslaughter due to EMED. He points out, correctly, that because the jury found him guilty under count I of the complaint, they concluded that he had a single intent to kill more than one person. *See Briones v. State*, 74 Haw. 442, 454–56, 848 P.2d 966, 973–74 (1993). Yamada argues that, because he only committed one criminal offense, the trial court erred by convicting him of two counts of manslaughter due to EMED.

EMED, however, is not a criminal offense, but rather a mitigating defense to the offense of first and second degree murder that reduces the offense to manslaughter. *Whiting v. State*, 88 Hawai'i 356, 360, 966 P.2d 1082, 1087 (1998); *State v. Holbron*, 80 Hawai'i 27, 42, 904 P.2d 912, 927 (1995) (citing *State v. Pinero*, 70 Haw. 509, 523–24, 778 P.2d 704, 713–14 (1989)). This court has described EMED as "a special defense idiosyncratic to a charge of murder that mitigates a defendant's culpability for murder by diminishing his penal liability for the offense." *Whiting*, 88 Hawai'i at 361, 966 P.2d at 1087. The jury verdict in this case established: (1) that the jury concluded beyond a reasonable doubt that Yamada intentionally or knowingly caused the death of two people in the same incident; and (2) that the prosecution failed to negative Yamada's EMED defense. *See* HRS § 702–205(3)(b) (1993). Yamada was thus absolved from penal liability for murder but, by operation of law, found to be criminally responsible for manslaughter. *See Whiting*, 88 Hawai'i at 360, 966 P.2d at 1086. The question is whether, under HRS § 707–702(2), a defendant charged with murder in the first degree, in violation of HRS § 707–701(1)(a), who in fact caused the death of multiple persons, is culpable for only one offense of manslaughter due to EMED, as Yamada argues, or whether culpability may be measured by the number of lives taken.[6]

This issue is ultimately one of statutory interpretation. When construing a statute, "our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself." *State v. Cullen*, 86 Hawai'i 1, 9, 946 P.2d 955, 963 (1997) (citing *Gray*, 84 Hawai'i at 148, 931 P.2d at 590). This court reads statutory language "in the context of the entire statute and construe[s] it in a manner consistent with its purpose." *Id.*

First, I note that the language of Hawaii's EMED manslaughter statute provides little assistance in this regard:

---

**5.** A person commits the offense of murder in the first degree, in violation of HRS § 707–701(1)(a), if the person "intentionally or knowingly" causes the death of "[m]ore than one person in the same or separate incident[.]"

**6.** The prosecution established beyond a reasonable doubt that Yamada intentionally or knowingly killed Carla Russell and Rachel DeCambra. The prosecution failed to prove only that Yamada was not under the influence of an extreme mental or emotional disturbance when he pulled the trigger.

In a prosecution for murder in the first or second degrees it is a defense, which reduces the offense to manslaughter, that the defendant was, at the time he caused the death of the other person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation.

HRS § 707–702(2).[7] Reading the statute *in pari materia*, taking into account the definitions of first and second degree murder, the statute is ambiguous. "Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called in aid to explain what is doubtful in another." HRS § 1–16 (1993); *see also State v. Kupihea*, 98 Hawai'i 196, 202, 46 P.3d 498, 504 (2002). While HRS § 707–702(2) operates to "reduce[ ] the offense to manslaughter," the statute does not address the *manner* in which such reduction is executed. It is also apparent that the statute *does not preclude* multiple convictions of manslaughter due to EMED where a defendant has been charged with one offense encompassing several deaths. As the majority states, "[w]hen

there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists," the meaning of which may be sought be examining the context of the statute and legislative intent. Majority at 548, 57 P.3d 473.

Second, I look to the statutory scheme to ascertain legislative intent. It is clear from the language of HRS § 707–702(2) that the EMED defense applies to murder in the first degree. The legislature created the offense of "murder in the first degree," HRS § 707–701(1)(a), to impose a more severe sentence upon those who kill multiple persons in the same or separate incidents.[8] Interpreting HRS § 707–702(2) to preclude more than one conviction of manslaughter due to EMED where a defendant has in fact killed more than one person, would be to construe HRS § 707–702(2) in a manner inconsistent with clear legislative intent to impose a more severe punishment for those found guilty of first degree murder.[9] It is inconceivable that successful prosecution of all the elements for murder in the first degree (save negating an EMED defense), would result in only one conviction for manslaughter when

---

7. In 1987, the legislature amended HRS § 707–702(2) to reflect revisions to the penal code by adding the words "in the first and second degrees" after the word "murder." *See* 1987 Haw. Sess. L. Act 181, at 407; Sen. Stand. Comm. Rep. No. 1130, 1987 Senate Journal, at 1393 (noting that the amendment simply "substitutes new murder crimes for murder where the defense of extreme mental or emotional distress reduces the offense to manslaughter").

8. HRS § 707–701(1) carries a mandatory sentence of life imprisonment without the possibility of parole. *See* HRS § 706–656(1); Sen. Stand. Com. Rep. No. 820–86, in 1986 Senate Journal, at 1169 ("Your Committee intends that persons convicted of multiple killings which occur in the same incident or separate incidents be subject to life imprisonment without the benefit of parole."); Sen. Conf. Comm. Rep. No. 51–86, in 1986 Senate Journal, at 747 ("Your Committee intends that persons convicted of serial killings be subject to life imprisonment without parole.").

9. I do not disagree with Yamada that count I of the complaint, murder in the first degree in violation of HRS § 707–701(1)(a), charged him with a single offense. This offense, however, contemplated two deaths. The prosecution could have foregone the first degree murder charge and instead pursued two charges of second degree murder, in which case there is no dispute that

Yamada could have been convicted of two counts of manslaughter due to EMED. Likewise, if Yamada were prosecuted for killing Carla Russell and Rachel DeCambra in 1986, prior to the legislature's creation of the "murder in the first degree" offense, he would likely have been charged with two counts of murder, in violation of HRS § 707–701(1) (1985). If the prosecution failed to disprove that Yamada was under the influence of extreme mental or emotional distress at the times he pulled the trigger, Yamada would have been entitled to acquittals of the murder charges, but would have been criminally culpable for two counts of manslaughter due to EMED. HRS § 707–702(2) (1985); HRS § 702–205(3)(b) (1985).

Additionally, I do not disagree with the majority that HRS § 707–701(1)(a) "does not predicate the severity of the resulting punishment upon the particular number of persons whom the jury determines the defendant has killed." Majority at 553–554, 57 P.3d at 478–479. Put simply, the statute could not predicate the severity of the punishment on the number of persons killed because short of imposing the death penalty, life imprisonment without the possibility of parole leaves nothing that can be added in terms of punishment. Thus, the majority is certainly correct that "[b]e it two people or twenty, the punishment flowing from a violation of HRS § 707–701(1)(a) does not vary as a function of the

successful prosecution of all the elements for two counts of murder in the second degree (save negating an EMED defense) would result in two convictions for manslaughter. Thus, a conclusion that a defendant who has in fact killed two people is criminally culpable for only one death, solely because the prosecutor charged one count of first degree murder rather than two counts of second degree murder would be, in our view, absurd.[10] *See* HRS § 1–15(3) (1993) ("Every construction which leads to an absurdity shall be rejected."); *State v. Arceo*, 84 Hawai'i 1, 19, 928 P.2d 843, 861 (1996) (stating that the legislature is presumed not to intend an absurd result) (citation omitted).

Accordingly, I would hold that a defendant who knowingly or intentionally causes the death of one or more persons in the same or separate incidents may be convicted and sentenced for one count of manslaughter due to EMED for each person killed, without respect for whether the defendant is charged with murder in the first degree, in violation of HRS § 707–701(1)(a), or two counts of murder in the second degree, in violation of HRS § 707–701.5. The trial court did not err by convicting Yamada of two counts of manslaughter in violation of HRS § 707–702(2).

For the foregoing reasons, I would affirm Yamada's conviction of and sentence for two counts of manslaughter due to EMED.

number of victims." *Id.* at 554, 57 P.3d at 479. In writing HRS § 707–701(1), the legislature has already imposed its most severe punishment.

Finally, the majority fails to understand that the legislature intended that the distinguishing factor between murder in the first degree and murder in the second degree is not the length of the term (they are both life sentences), but the fact that those convicted of murder in the first degree do not have the benefit of parole. *Compare* HRS § 706–656(1) (1993) (describing sentencing for murder in the first degree and attempted murder in the first degree) *with* HRS § 706–656(2) (1993 & Supp.2000) (describing sentencing for murder in the second degree and attempted murder in the second degree) (I note that if the circumstances for enhanced sentencing under § 706–657 are met, the court may sentence a person convicted of murder in the second degree to life imprisonment without the possibility of parole). The majority cites as "one of several [anomalies] embedded in HRS ch. 707, pt. II," majority at 554, 57 P.3d at 479, the following:

> For example, pursuant to HRS § 706–656(1) (1993), had Yamada been convicted of first degree murder as charged in Count I, he would have been subject to *one* mandatory sentence of life imprisonment without the possibility of parole. However, had the jury acquitted Yamada of first degree murder but convicted him of the two counts of second degree murder charged in Counts II and III, he would have been subject, pursuant to HRS § 706–656(2) (Supp.2001), to *two* mandatory sentences of life imprisonment with the possibility of parole, which, pursuant to HRS § 706–668.5 (1993), the sentencing court could impose concurrently or consecutively in its discretion.

Majority at 554, 57 P.3d at 479. Contrary to its belief, the majority has not identified an anomaly in the legislature's statutory scheme for criminal homicides. Short of commutation, a person convicted of murder in the first degree is sentenced to life imprisonment without the benefit of parole. *See* HRS § 706–656(1). Thus, the fact that there are multiple life sentences, or consecutive rather than concurrent sentences, has no effect on a person who does not have the benefit of parole.

10. In response to this argument, the majority argues that they cannot agree with the bifurcation of a single charge of first degree murder into multiple convictions of EMED manslaughter. Majority at 553, 57 P.3d at 478. The majority narrowly focuses its analysis on the word "offense," without considering the context in which it is used and repeatedly emphasizes the fact that the word is used in its singular form. *See* Majority at 552, 553, 57 P.3d at 477, 478. By doing this, the majority fails to abide by well-established rules of statutory interpretation. *See Kupihea*, 98 Hawai'i at 202, 46 P.3d at 504 (stating that laws *in pari materia* should be construed together); *State v. Pacheco*, 96 Hawai'i 83, 94, 26 P.3d 572, 583 (2001) (stating that statutory language should be read in the context of the entire statute and construed in a manner consistent with its purpose). Allowing a defendant's first degree murder charge, for the murder of more than one individual, to be mitigated to only one count of EMED manslaughter, while subjecting a defendant charged of two counts of second degree murder for the same crime to two counts of EMED manslaughter upon a showing of mitigation, is tantamount to giving the first degree murder defendant a "get out of jail free" card for every additional murder. I submit, based on the doctrine of *in pari materia* and the purpose of the EMED manslaughter statute, that the legislature did not intend to afford such inconsistent leniency under the EMED statute and could not have intended such an absurd result.