*** FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER ***

Electronically Filed
Supreme Court
SCWC-21-0000478
29-DEC-2023
08:12 AM
Dkt. 45 OP

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I,
Respondent/Plaintiff-Appellee,

vs.

KUMULIPO IWA COYOTE SYLVA,
Petitioner/Defendant-Appellant.

SCWC-21-0000478

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-21-0000478; CASE NO. 2CPC-18-0000240)

DECEMBER 29, 2023

RECKTENWALD, C.J., McKENNA AND EDDINS, JJ.,
CIRCUIT JUDGE KAWASHIMA IN PLACE OF NAKAYAMA, J., RECUSED,
AND CIRCUIT JUDGE NAKAMOTO IN PLACE OF WILSON, J., RECUSED

OPINION OF THE COURT BY McKENNA, J.

**I.    Introduction**

Defendant Kumulipo Iwa Coyote Sylva ("Sylva") was charged

by indictment with second-degree murder for killing Eduardo

Alejandro Cerezo ("Cerezo").  Sylva admitted to killing Cerezo

but asserted the affirmative defense of a physical or mental

disease, disorder, or defect excluding penal responsibility ("insanity").

Sylva's jury trial turned largely on the testimony of three medical examiners appointed by the Circuit Court of the Second Circuit ("circuit court"). The examiners testified concerning Sylva's mental state pursuant to Hawai'i Revised Statutes ("HRS") § 704-410 (2014). All three examiners agreed Sylva was affected by a mental disease, disorder, or defect at the time of the conduct. Two of the examiners further opined that, as a result, Sylva lacked capacity under the legal standard for insanity, thus excluding criminal responsibility. One examiner disagreed.

The circuit court struck parts of the testimony of one of the examiners who had opined that Sylva lacked capacity, psychiatrist Martin Blinder, M.D. ("Dr. Blinder"). Defense counsel had asked Dr. Blinder to explain the basis for his opinion. The prosecutor objected to the "last phrase" of Dr. Blinder's answer, in which Dr. Blinder stated Sylva was not a "bad man who goes around hurting people." (Emphasis added.) But after a sidebar, the circuit court instructed the jury to disregard Dr. Blinder's "last response." (Emphasis added.) The circuit court also sustained the prosecutor's objection to Dr. Blinder's later testimony that to a reasonable degree of medical probability, but for Sylva's mental illness, he would not have

killed Cerezo. The circuit court stated before the jury, "I ordered it stricken earlier. I'll order it stricken again."

Sylva was convicted of manslaughter based on extreme mental or emotional disturbance ("EMED").

We hold the circuit court erroneously struck parts of Dr. Blinder's testimony because (a) a reasonable juror could have believed the circuit court instructed them to disregard Dr. Blinder's entire answer explaining his opinion that Sylva lacked capacity; (b) HRS § 704-410(4) provides that medical examiners appointed pursuant to that chapter "shall be permitted to make any explanation reasonably serving to clarify" their opinion; and (c) the circuit court's error was not harmless beyond a reasonable doubt because Sylva's insanity defense turned largely on the medical examiners' testimonies.

We also hold the circuit court properly instructed the jury on the application of the insanity defense to manslaughter based on EMED.

We therefore vacate the circuit court's January 24, 2020 judgment, conviction, and sentence; as well as the Intermediate Court of Appeal's ("ICA") January 3, 2023 judgment on appeal. We remand to the circuit court for further proceedings consistent with this opinion.

## II. Background

### A. Factual background

On March 18, 2018, Sylva was arrested for killing Cerezo with a cane knife.[1]

According to eyewitness Kyle Keoho ("Keoho"), earlier that afternoon, Keoho and Cerezo had boarded a bus in Pukalani, Maui. While on the bus, they noticed another passenger, Sylva, "looking at [Cerezo] mean." Cerezo called Sylva a "pussy" and threatened to beat him up. When the bus arrived at the Queen Ka'ahumanu Center in Kahului, Sylva, Keoho, and Cerezo got off the bus. Sylva challenged Cerezo to a fight. Cerezo said he did not want to fight. Sylva stormed off.

Shortly after, Cerezo and Keoho made a purchase and entered a mall restroom. Sylva entered the restroom with a cane knife. Sylva said, "you guys are like demons. I send them to the moon." Sylva struck Cerezo's neck with the cane knife, killing him. Sylva stated, "Oh, I guess he was a demon," and told Keoho, "Believe it or not, he was a demon."

Witnesses at trial testified that Sylva then fled the scene, stopping to hide his jacket and the cane knife. Sylva was apprehended by police at Kahului Community Center Park.

---

[1]    The parties and witnesses at times refer to the weapon as a machete.

Sylva made various other references to demons before and after his arrest.

## B.    Circuit court proceedings[2]

Sylva was charged by indictment[3] with the offense of murder in the second degree in violation of HRS § 707-701.5 (2014). Sylva did not deny that he caused Cerezo's death but asserted the affirmative defense of insanity.

### 1.    Medical examination

Sylva filed a motion for examination to determine fitness to proceed and/or penal responsibility.[4]  Pursuant to HRS § 704-400 (2014), a person is not criminally responsible under the Hawai'i Penal Code if, "at the time of the conduct as a result of physical or mental disease, disorder, or defect the person lacks substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform the person's conduct to the requirements of law."  The circuit court appointed three individuals to examine Sylva's penal responsibility pursuant to

---

[2]    The Honorable Richard T. Bissen, Jr. presided over Sylva's trial.

[3]    The State of Hawai'i ("the State") first filed a complaint in the District Court of the Second Circuit ("district court") charging Sylva with second-degree murder.  After Sylva was indicted in the circuit court, the district court case was dismissed without prejudice.

[4]    The circuit court twice suspended the proceedings to examine Sylva's fitness to proceed, but the parties ultimately stipulated Sylva was fit to proceed based on the uncontested findings of medical examiners appointed pursuant to HRS § 704-404 (Supp. 2016).

HRS § 704-407.5 (Supp. 2016): (1) Melissa Vargo, Psy.D. ("Dr. Vargo"), (2) Dr. Blinder, and (3) George C. Choi, Psy.D. ("Dr. Choi").[5] The examiners submitted reports opining on Sylva's mental state at the time of the conduct.

### 2. Medical examiners' trial testimonies

At trial, amongst various other witnesses, Sylva called Dr. Vargo and Dr. Blinder to testify, and the State called Dr. Choi. All three examiners opined Sylva was affected by a mental disease, disorder, or defect at the time of the conduct. Only Dr. Choi opined that mental state did not substantially impair Sylva's capacity so as to exclude penal responsibility.

### a. Dr. Vargo

First, Dr. Vargo, a clinical psychologist, opined that at the time of the conduct, Sylva suffered from schizoaffective disorder, bipolar type, causing Sylva to experience hallucinations and delusions as well as mania and depression. Dr. Vargo further opined that to a degree of psychological certainty, Sylva lacked the "capacity to appreciate the wrongfulness of his conduct or to conform his behavior to the conduct of the law" at that time. Dr. Vargo explained the basis

---

[5]     Dr. Vargo and Dr. Blinder were originally appointed by the district court in the related district court proceedings. See supra note 3. The parties stipulated to incorporate the earlier examinations of Dr. Vargo and Dr. Blinder in the circuit court.

for her opinion, including that Sylva had told her he did not believe killing Cerezo was wrong because Cerezo was a demon; it was a service to God.

### b. Dr. Blinder

Next, Dr. Blinder, a forensic psychiatrist, opined that Sylva suffered from a psychotic disability profoundly affecting his ability to think clearly and his interpretation of what he sees. Dr. Blinder also opined Sylva's criminal responsibility was "utterly lacking" at the time he killed Cerezo, and that Sylva's disorder "resulted in a lack of capacity to control conduct under the law or appreciate wrongfulness."

Defense counsel asked Dr. Blinder to explain the basis for his opinion: "And could you help us explain why that is your opinion." Dr. Blinder responded:

> Let me tell you how I go about making these judgments. The first thing that I look at when there's a homicide is whether or not there's a reasonable reason for the defendant to have done what he did. I'm not saying a good reason. There's never a good reason to kill someone. But maybe a drug bust – a drug deal that went bad, guy is supposed to give him drugs, he pays him and doesn't get the money, he takes his life, or he's insulted on a racial basis or something that we wouldn't approve of but we can understand, that there's been a longstanding conflict between the killer and the person that he kills, and it's unforgivable but understandable.
> I look for that. If I find that, then it's pretty well the end of my participation. So even if he's got a mental illness, I don't care. We've got a rational reason for doing it. A doubt – being paranoid is not therapeutic, but that's irrelevant. I'm done. As far as I'm concerned, he does not meet that standard that you just heard.
> In the case of Mr. Sylva, there is no rational reason. There's a very superficial reason, but the basic reason is he's got a mission, he's got a mission to rid the world of demons, and he was just getting started. This was obviously, in his delusional mind, a dangerous demon, and

7

> for some reason, he – he's been anointed by what he reads in the Bible to take care of this problem.
> <u>And that's nutty and it's crazy, and absent for that nutty, crazy thing, he wouldn't have hurt anybody. He's not, you know, a bad man who goes around hurting people.</u> But when he –

(Emphasis added.)

The prosecutor then objected, "Your honor, I'm sorry, I'm going to object to the <u>last phrase</u> and ask that it be stricken." (Emphasis added.) Defense counsel asked on what grounds, and the circuit court stated, "that wasn't the question that was asked." The parties then approached the bench for a sidebar. The following discussion was held outside the hearing of the jury:

> THE COURT: Sorry. So here's what he said in the answer: "If it wasn't for this nutty thing, he wouldn't have hurt anybody. He's not a bad man."
> What part of that was the opinion that went to the question you asked?
> [DEFENSE COUNSEL]: I think he was explaining why he arrived to that opinion.
> THE COURT: No, no. I get that part, and that part he can answer.
> [DEFENSE COUNSEL]: Okay.
> THE COURT: But he says – he's just editorializing, saying if it wasn't for this, this wouldn't happen and he's not a bad man. If that was the question you asked, that would be okay, but that's not the question you asked. And the State is correct, I think, in saying he's going beyond the opinion.
> . . . .
> THE COURT: I mean, saying that he's not a bad man, that's not the issue. So I'll sustain the objection – . . . . and have it stricken.

When they returned, the circuit court stated to the jury, "Ladies and gentlemen, I'll ask you to disregard the <u>last response</u> made by the witness and order that it be stricken." (Emphasis added.)

8

Defense counsel then continued direct examination of Dr. Blinder, and the circuit court again struck a portion of Dr. Blinder's testimony explaining the basis for his opinion:

> BY [DEFENSE COUNSEL]:
> Q.  Your opinion is based in part on the fact that there is no rational explanation, correct?
> A.  Yes.  Based – to a reasonable degree of medical probability, there does not appear to be a rational basis for his action, and that but for his psychotic illness, he would not have taken the life of this man.
> [PROSECUTOR]:  Your Honor, I'm going to object, move to strike that.  It's speculative.
> [DEFENSE COUNSEL]:  Your Honor, it is his opinion and he's explaining why.
> THE COURT:  It's his opinion that he suffers from –
> [DEFENSE COUNSEL[6]]:  It's the second part.
> THE COURT:  I know.  I heard.  He's – it's his opinion that he suffers from a mental disease, and he's giving a conclusion – or, excuse me, the word opinion about that.  He's adding on to that at the end of the answer.  I ordered it stricken earlier.  I'll order it stricken again.
> Ladies and gentlemen, when the Court orders something stricken, you're not to consider it in your deliberations in any way.  I'll give you an instruction on that later.

(Emphases added.)

On cross-examination, the prosecutor also questioned Dr. Blinder concerning the basis for his opinion:

> Q.  So, Doctor, you – something you said earlier was that the first thing you look to is for a reasonable reason for committing a crime, correct?
> A.  Yes.
> Q.  And even though it might not be reasonable, let's say, to us – you gave the example, I think, of a drug – drug deal gone bad was one of the reasons, right?
> A.  Yes, sir.
> Q.  Okay.  So what you're saying is, of course, the normal person who is not involved in drug deals wouldn't kill over those types of things, right?  But as a forensic psychologist looking for a reasonable or rational basis for

---

[6]     The transcript states defense counsel made this statement, but as the ICA noted, the context indicates it may have actually been made by the prosecutor.  See State v. Sylva, No. CAAP-21-0000478, 2022 WL 17350568, at *3 n.6 (Haw. App. Dec. 1, 2022) (SDO).

9

a killing, that is an example of something that you would find reasonable or rational, correct?

A. Yeah. Specifically I'm looking for a non-mental illness reason.

Q. . . . .
Another thing you said was something like a – someone receives a racial insult, right?

A. Yes.

Q. Okay. So, for example, . . . Cerezo and . . . Keoho got on the bus in this case and there's a verbal altercation between those two and [Sylva], . . . they taunt him. Would that be one of the things that you might be looking for?

A. That's a hypothetical that I certainly would consider, yes.

Q. Certainly if it – let's say those taunts or – or name calling got to the point where the defendant felt that he was ready to fight them on the bus or right after they got off. I mean, that's additional information in a hypothetical setting that might be helpful to you, correct?

A. Yes.

Q. And specifically in looking for that rational or reasonable – reasonable basis for the crime, for the killing, right?

A. Yes.

Q. Okay. And those are the types of things that would weigh in favor or at least make you think twice about whether or not there was some sort of rational or reasonable basis for a killing, correct?

A. Right. We have two possibilities: One, as I say, but for a psychosis, they would not have killed; the other is, did this altercation or hypothetical provocation from the decedent reach that requisite reasonable response that a nonpsychotic person would act in the way that Mr. Sylva did? And that's the very first thing I look at in a case like this.

That testimony was not stricken.

### c. Dr. Choi

The State called the third examiner, Dr. Choi, a clinical psychologist. Dr. Choi opined Sylva was suffering from schizoaffective disorder. However, unlike the other two examiners, Dr. Choi also opined that although Sylva was suffering from mental illness, "his capacity, cognitive and volitional capacity, did not reach a threshold of substantial

impairment" at the time of the conduct.  Dr. Choi testified his opinion was based on various factors including that (1) Sylva used marijuana either on the day of or the day before the killing; (2) Sylva did not have a history of violent behavior towards "demons" or anyone else, indicating an ability to differentiate between right and wrong; (3) Sylva utilized emergency rooms to get medications, indicating Sylva was aware of his condition and knew how to get help; (4) Sylva attempted to hide his jacket and cane knife after killing Cerezo, indicating he knew he did something wrong; and (5) it appeared Cerezo provoked Sylva on the bus and that Sylva wanted to teach Cerezo a lesson, indicating goal-oriented behavior.

### 3.  Jury instructions

After closing arguments, the circuit court instructed the jury on the insanity and EMED affirmative defenses as follows:

#### Instruction No. 25

> The defendant has raised the affirmative defense of physical or mental disease, disorder or defect excluding criminal responsibility.  Before you may consider this affirmative defense, you must first determine whether the prosecution has proven all of the elements of Murder in the Second Degree or the included offense of Manslaughter beyond a reasonable doubt.  If you unanimously find that the prosecution has not proven all of the elements of Murder in the Second Degree or the included offense of Manslaughter beyond a reasonable doubt, then you must find the defendant not guilty of that offense without considering the affirmative defense.  If you unanimously find that the prosecution has proven all of the elements of Murder in the Second Degree or the included offense of Manslaughter beyond a reasonable doubt, then you must consider the affirmative defense.
> . . . .
> If you unanimously find that the defendant has proven both elements of the affirmative defense by a preponderance

11

of the evidence, then you must find the defendant not guilty of Murder in the Second Degree or the included offense of Manslaughter by reason of physical or mental disease, disorder or defect excluding criminal responsibility.  <u>If you unanimously find that the defendant has not proven both elements of the affirmative defense by a preponderance of the evidence, then you must consider the affirmative defense of Extreme Mental or Emotional Disturbance</u>.  (See instruction No. <u>26</u>)

. . . .

**Instruction No. <u>26</u>**

<u>If and only if</u> you unanimously find that all of the material elements of Murder in the Second Degree have been proven by the prosecution beyond a reasonable doubt, or you unanimously find that all of the material elements of the included offense of Manslaughter have been proven by the prosecution beyond a reasonable doubt, and <u>you unanimously find that the defendant has not proven the elements of the affirmative defense of physical or mental disease, disorder or defect excluding criminal responsibility by a preponderance of the evidence, then you must consider the affirmative defense of Extreme Mental or Emotional Disturbance</u>.

. . . .

(Emphases added.)  Sylva did not object.

## 4.    Jury verdict, conviction, and sentencing

The jury returned a verdict of guilty of manslaughter based on EMED.  Accordingly, on January 24, 2020, the circuit court entered its judgment, conviction, and sentence; in which it found Sylva guilty of manslaughter based on EMED and sentenced him to twenty years of incarceration.

## C.    ICA proceedings

Sylva appealed.  Sylva asserted the circuit court (1) erroneously instructed the jury to disregard parts of Dr. Blinder's testimony, and (2) failed to instruct the jury that if it found Sylva guilty of manslaughter based on EMED, it must consider the affirmative defense of insanity.

12

Pursuant to its summary disposition order filed December 1, 2022, the ICA affirmed Sylva's conviction. Sylva, 2022 WL 17350568, at *5.

First, the ICA determined "no reasonable juror could have understood the circuit court to have instructed them to disregard Dr. Blinder's entire explanation for his opinion." Sylva, 2022 WL 17350568, at *2. Citing Wakabayashi v. Hertz Corp., 66 Haw. 265, 272, 660 P.2d 1309, 1314 (1983), the ICA also concluded that even if the circuit court did erroneously strike Dr. Blinder's entire later statement that "[b]ased – to a reasonable degree of medical probability, there does not appear to be a rational basis for his action, and that but for his psychotic illness, he would not have taken the life of this man,"[7] the error was harmless because the testimony was cumulative. Sylva, 2022 WL 17350568, at *3.

---

[7]   It appears the ICA conflated Sylva's arguments concerning the two disputed portions of Dr. Blinder's testimony. Concerning the second portion of stricken testimony, the ICA stated,

> Sylva argues that the circuit court struck Dr. Blinder's entire answer: there did not appear to be a rational basis for Sylva's actions, and but for Sylva's psychotic illness he would not have taken [Cerezo's] life. The State contends that only the second part of the answer was stricken.

Sylva, 2022 WL 17350568, at *3. But Sylva had made only the following argument concerning the admissibility of the second portion of stricken testimony: "The trial court compounded its error when it also instructed the jury that it also could not consider Dr. Blinder's opinion that 'to a reasonable degree of medical probability,' but for Sylva's psychotic illness, he would not have killed Cerezo."

13

In concluding any error was harmless, the ICA cited the following testimony by Dr. Blinder, which the jury was allowed to consider: (1) Dr. Blinder's opinion that criminal responsibility was "utterly lacking" in Sylva's case; (2) Dr. Blinder's explanation for his opinion that Sylva was psychotic, and why Sylva's running away from the scene and hiding the weapon and his jacket were not inconsistent with a lack of criminal responsibility;[8] and (3) Dr. Blinder's defense of his opinion on cross-examination. Id.

Second, the ICA framed Sylva's jury instruction argument as concerning "the order in which the jury was instructed to decide the issues." Sylva, 2022 WL 17350568, at *4. The ICA concluded it made sense for the jury to consider the affirmative defense of insanity before the mitigating defense of EMED, rather than the other way around, because if the jury accepted Sylva's insanity defense, there would be no need to consider whether he was under the influence of EMED. Sylva, 2022 WL 17350568, at *5. Hence, the ICA also rejected Sylva's jury instruction argument. Id.

D. **Certiorari proceedings**

On certiorari, Sylva contends that the ICA gravely erred in concluding the circuit court did not (1) erroneously strike

---

[8] As explained infra, we do not agree that a reasonable juror would have believed they were allowed to consider this explanation.

14

parts of Dr. Blinder's testimony explaining the basis for his opinion that Sylva lacked capacity; or (2) commit instructional error regarding the application of the insanity defense to manslaughter based on EMED.

## III. Standards of Review

### A. Statutory interpretation

> The interpretation of a statute is a question of law that this court reviews de novo. When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

State v. Abion, 148 Hawai'i 445, 454, 478 P.3d 270, 279 (2020) (cleaned up).

### B. Jury instructions

"The standard of review for jury instructions that were not objected to at trial was clarified in State v. Nichols, 111 Hawai'i 327, 141 P.3d 974 (2006)[.]" State v. DeLeon, 131 Hawai'i 463, 479, 319 P.3d 382, 398 (2014). In Nichols, we held that

> although as a general matter forfeited assignments of error are to be reviewed under [Hawai'i Rules of Penal Procedure ("HRPP")] Rule 52(b) [(1977)] plain error standard of review, in the case of erroneous jury instructions, that standard of review is effectively merged with the HRPP Rule 52(a) harmless error standard of review because it is the duty of the trial court to properly instruct the jury. As a result, once instructional error is demonstrated, we will vacate, without regard to whether timely objection was made, if there is a reasonable possibility that the error contributed to the defendant's conviction, *i.e.*, that the erroneous jury instruction was not harmless beyond a reasonable doubt.

15

111 Hawai'i at 337, 141 P.3d at 984 (footnote omitted).

> Thus, the appellant must first demonstrate instructional error by rebutting the presumption that unobjected-to jury instructions are correct. If the appellant is able to rebut this presumption, the burden shifts to the State to prove that the error was harmless beyond a reasonable doubt because [e]rroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial. However, error is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled.
> If the State cannot demonstrate that the error was harmless beyond a reasonable doubt, the conviction must be vacated.

DeLeon, 131 Hawai'i at 479, 319 P.3d at 398 (cleaned up).

## IV. Discussion

### A. The circuit court erroneously instructed the jury to disregard parts of Dr. Blinder's testimony that should have been admitted under HRS § 704-410(4)

Sylva first asserts the ICA gravely erred in concluding (a) the circuit court did not erroneously strike parts of Dr. Blinder's testimony explaining the basis for his opinion that Sylva lacked capacity under the legal standard for insanity, and (b) that any such error was harmless. We agree.

#### 1. A reasonable juror could have believed the circuit court instructed them to disregard Dr. Blinder's entire answer explaining his opinion

The ICA erroneously concluded that "no reasonable juror could have understood the circuit court to have instructed them to disregard Dr. Blinder's entire explanation for his opinion." Sylva, 2022 WL 17350568, at *2.

16

After Dr. Blinder opined Sylva lacked capacity at the time of the conduct, defense counsel asked him to explain the basis for his opinion.  The prosecutor objected to the "last phrase" of Dr. Blinder's answer, in which he stated Sylva is not a "bad man who goes around hurting people."  (Emphasis added.) However, after a sidebar, the circuit court instructed the jury to disregard Dr. Blinder's "last response."  (Emphasis added.) A reasonable juror could have interpreted the term "response" to refer to Dr. Blinder's entire answer to defense counsel's question based on its common meaning.  See Response, Cambridge Advanced Learner's Dictionary (4th ed. 2013) (defining "response" as "an answer or reaction" (emphasis added)).

The State points to the sidebar discussion to argue the circuit court only struck the "last phrase" of Dr. Blinder's answer.  But although the jurors heard the State object to the "last phrase," they were not privy to the sidebar discussion concerning which part(s) of Dr. Blinder's testimony were objectionable and why.  The jurors only heard the circuit court instruct them to disregard Dr. Blinder's "last response."  The sidebar discussion is not part of the circuit court's actual instruction to the jury.  The jurors may well have surmised that although the objection was to the "last phrase," based on the sidebar, the circuit court decided to strike the entire "last response."

17

Whether or not a reasonable juror could have interpreted the circuit court's instruction to disregard Dr. Blinder's "last response" as striking Dr. Blinder's entire answer, a later comment by the circuit court would have led them to that conclusion.

Later during direct examination, Dr. Blinder testified, "Based – to a reasonable degree of medical probability, there does not appear to be a rational basis for [Sylva's] action, and that but for his psychotic illness, he would not have taken the life of this man."  The circuit court again sustained the prosecutor's objection and stated in front of the jury:  "it's his opinion that he suffers from a mental disease, and he's giving a[n] . . . opinion about that.  He's adding on to that at the end of the answer.  I ordered it stricken earlier.  I'll order it stricken again."  (Emphasis added.)

Those statements implied to the jury that the circuit court had struck more than just the "last phrase" of Dr. Blinder's earlier answer because Dr. Blinder's statement that Sylva would not have killed Cerezo absent his mental disorder was not the "last phrase" of Dr. Blinder's earlier response.  It was the

18

second to last sentence.[9] And the circuit court said it had "ordered it stricken earlier."[10]

We therefore conclude a reasonable juror could have believed the circuit court instructed them to disregard Dr. Blinder's entire answer explaining the basis for his opinion that Sylva lacked capacity at the time of the conduct.

**2.  HRS § 704-410(4) provides that medical examiners "shall be permitted to make any explanation reasonably serving to clarify" their opinion**

Dr. Blinder's stricken answer to defense counsel's question about the basis for his opinion was admissible to clarify his opinion under HRS § 704-410(4). Indeed, HRS § 704-410(4) mandates its admission as a significant part of an insanity defense "reasonably serving to clarify the examiner's diagnosis and opinion."

HRS chapter 704 governs the determination of a defendant's penal responsibility based on the insanity defense. HRS § 704-401 (2014) provides, "Evidence that the defendant was affected by a physical or mental disease, disorder, or defect is admissible whenever it is relevant to prove that the defendant

---

[9]  The end of Dr. Blinder's response reads, "And that's nutty and it's crazy, and absent for that nutty, crazy thing, he wouldn't have hurt anybody. He's not, you know, a bad man who goes around hurting people. But when he –"

[10]  The State argues a reasonable juror would have interpreted the circuit court's comment to refer solely to Dr. Blinder twice "adding on" to the end of his answer. We do not find this argument persuasive; at best, a reasonable juror could have been confused as to which parts of Dr. Blinder's testimony they were allowed to consider.

did or did not have a state of mind that is required to establish an element of the offense."

Where a defendant's capacity is at issue, section 704-407.5 provides for the appointment of three qualified examiners to report upon the defendant's "physical or mental disease, disorder, or defect" "at the time of the conduct" for which the defendant is prosecuted. See HRS § 704-407.5(1)-(2).[11] Section 704-410, in turn, governs testimony by the appointed examiners.[12] See id. § 704-410. Subsection (3) of section 704-410 provides that

> [w]hen an examiner testifies on the issue of the defendant's responsibility for conduct alleged or the issue of the defendant's capacity to have a particular state of mind which is necessary to establish an element of the offense charged, the examiner shall be permitted to make a statement as to the nature of the examiner's examination, the examiner's diagnosis of the physical or mental condition of the defendant at the time of the conduct

---

[11] In 2020, HRS § 704-407.5 was amended in part to "authorize the courts to enter into agreements to divert into residential, rehabilitative, and other treatment those defendants whose physical or mental disease, disorder, or defect is believed to have become or will become an issue in a judicial case." HRS § 704-407.5 cmt. (Supp. 2020) (citing 2020 Haw. Sess. Laws Act 26, § 7 at 298-99). That process was not available at the time of the circuit court proceedings in this case.

[12] Hawai'i Rules of Evidence ("HRE") Rule 702 (2016) generally governs the admissibility of expert testimony. It provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.

> alleged, and the examiner's opinion of the extent, if any, to which the capacity of the defendant to appreciate the wrongfulness of the defendant's conduct or to conform the defendant's conduct to the requirements of law or to have a particular state of mind which is necessary to establish an element of the offense charged was impaired as a result of physical or mental disease, disorder, or defect at that time.

Id. § 704-410(3). Subsection (4) further provides, "When an examiner testifies, the examiner shall be permitted to make any explanation reasonably serving to clarify the examiner's diagnosis and opinion and may be cross-examined as to any matter bearing on the examiner's competency or credibility or the validity of the examiner's diagnosis or opinion." Id. § 704-410(4) (emphases added). In using the language "shall be permitted," HRS § 704-410(4) mandates that a trial court admit "any explanation" of an examiner "reasonably serving to clarify the examiner's" opinion. See State v. Shannon, 118 Hawai'i 15, 25, 185 P.3d 200, 210 (2008) ("[I]t is a well-established tenet of our statutory interpretation that the use of the word 'shall' generally indicates the legislature's intention to make a provision mandatory, as opposed to discretionary." (citations omitted)).

In addition, the commentary to HRS § 704-410 explains that

> [s]ubsections . . . (3) and (4) assure that an expert who has examined the defendant will have an adequate opportunity to state and explain the expert's diagnosis of the defendant's relevant physical or mental condition and to state and explain the expert's opinion as to the impairment of the defendant's relevant capacities without

21

> being restricted to examination by means of the
> hypothetical question.

HRS § 704-410 cmt.

Here, Dr. Blinder was appointed to report on Sylva's criminal responsibility pursuant to HRS chapter 704.  At trial, Dr. Blinder testified in response to defense counsel's question concerning why it was his opinion that Sylva's psychotic disability resulted in a lack of capacity at the time of the conduct.  Dr. Blinder's answer to that question was admissible under HRS § 704-410(4) because it reasonably served to clarify Dr. Blinder's opinion.  It is undisputed that at minimum, the following part of Dr. Blinder's answer was admissible:

> Let me tell you how I go about making these judgments.  The first thing that I look at when there's a homicide is whether or not there's a reasonable reason for the defendant to have done what he did.  I'm not saying a good reason.  There's never a good reason to kill someone.  But maybe a drug bust – a drug deal that went bad, guy is supposed to give him drugs, he pays him and doesn't get the money, he takes his life, or he's insulted on a racial basis or something that we wouldn't approve of but we can understand, that there's been a longstanding conflict between the killer and the person that he kills, and it's unforgivable but understandable.
> I look for that.  If I find that, then it's pretty well the end of my participation.  So even if he's got a mental illness, I don't care.  We've got a rational reason for doing it.  A doubt – being paranoid is not therapeutic, but that's irrelevant.  I'm done.  As far as I'm concerned, he does not meet that standard that you just heard.
> In the case of Mr. Sylva, there is no rational reason.  There's a very superficial reason, but the basic reason is he's got a mission, he's got a mission to rid the world of demons, and he was just getting started.  This was obviously, in his delusional mind, a dangerous demon, and for some reason, he – he's been anointed by what he reads in the Bible to take care of this problem.

But Dr. Blinder's next sentence, "And that's nutty and it's crazy, and absent for that nutty, crazy thing, he wouldn't have

22

hurt anybody," was also admissible under HRS § 704-410(4) because it reasonably served to clarify Dr. Blinder's opinion as to "the impairment of the defendant's relevant capacities." See HRS § 704-410 cmt. Thus, it was error for the circuit court to instruct the jury to disregard Dr. Blinder's entire answer.[13]

It was also error for the circuit court to strike Dr. Blinder's later testimony that to a reasonable degree of medical probability, "but for [Sylva's] psychotic illness, he would not have taken the life of this man." The State argues the circuit court properly struck that portion of Dr. Blinder's testimony as speculative. However, that testimony, too, falls under the purview of HRS § 704-410(4) because it similarly reasonably served to clarify Dr. Blinder's opinion that Sylva lacked capacity.

**3. The erroneous striking of parts of Dr. Blinder's testimony explaining his opinion was not harmless beyond a reasonable doubt**

We have said:

> [E]rror is not to be viewed in isolation [or] considered purely in the abstract. Recognizing as much, this court applies the harmless error doctrine to errors that occur in the trial process . . . . Consistent with the harmless error doctrine, we have frequently stated that error must be examined in light of the entire proceedings and given the effect to which the whole record shows it is entitled. In that context, the real question becomes whether there is

---

[13] Because we hold that a reasonable juror could have interpreted the circuit court to instruct them to disregard Dr. Blinder's entire answer, including the above paragraphs, we need not decide whether the "last phrase" of Dr. Blinder's answer, that Sylva is not a "bad man who goes around hurting people," was properly excluded.

> <u>a reasonable possibility that the error might have contributed to conviction</u>.

State v. Aplaca, 96 Hawai'i 17, 25, 25 P.3d 792, 800 (2001) (emphasis added) (cleaned up). "[W]here there is a wealth of overwhelming and compelling evidence tending to show the defendant guilty beyond a reasonable doubt, errors in the admission or exclusion of evidence are deemed harmless." State v. Veikoso, 126 Hawai'i 267, 276, 270 P.3d 997, 1006 (2011) (quoting State v. Toyomura, 80 Hawai'i 8, 27, 904 P.2d 893, 912 (1995)). "[A] narrow or strict application of the harmless error rule appropriately protects a defendant's rights and the integrity of the trial process." Aplaca, 96 Hawai'i at 27 n.7, 25 P.3d at 802 n.7.

Citing a civil case, Wakabayashi, 66 Haw. at 272, 660 P.2d at 1314, the ICA concluded that even if the circuit court erroneously struck Dr. Blinder's statement that "[b]ased – to a reasonable degree of medical probability, there does not appear to be a rational basis for his action, and that but for his psychotic illness, he would not have taken the life of this man," the error was harmless because the testimony was cumulative. Sylva, 2022 WL 17350568, at *3.

However, our holding in civil cases that "where essentially the same evidence is given by . . . other means, the trial court's exclusion of relevant evidence constitutes harmless

error" does not apply to the criminal context.  See Wakabayashi, 66 Haw. at 272, 660 P.2d at 1314 (citing Kekua v. Kaiser Found. Hosp., 61 Haw. 208, 219, 601 P.2d 364, 371 (1979)).  The ICA erred when it applied that holding to Sylva's case.  Our application of the harmless error rule in criminal cases is narrower, and the ultimate standard must always be "whether there is a reasonable possibility that the error might have contributed to conviction."  See Aplaca, 96 Hawai'i at 25, 27 n.7, 25 P.3d at 800, 802 n.7 (quoting State v. Gano, 92 Hawai'i 161, 176, 988 P.2d 1153, 1168 (1999)).

Parts of Dr. Blinder's erroneously stricken explanation for his opinion may have been cumulative.  On cross-examination by the State, the jury heard Dr. Blinder again explain his process for determining whether a defendant is criminally responsible; that testimony was not struck.[14]  But Dr. Blinder did not again

---

[14]    Sylva does not raise his constitutional right to present a complete defense, but we emphasize that such right is held by the defendant and is not satisfied solely by evidence elicited by the State.  See U.S. Const. amend. XIV; Haw. Const. art. I, § 5; Abion, 148 Hawai'i at 454, 478 P.3d at 279 ("Central to the protections of due process is the right to be accorded a meaningful opportunity to present a complete defense.  Thus, a defendant has the constitutional right to present any and all competent evidence in their defense." (emphasis added) (cleaned up)).
       Further, we have maintained that

> [l]ack of penal responsibility is not merely a statutory
> affirmative defense; it reflects a precept that is
> fundamental to due process under the Hawai'i Constitution:
> "A defendant who, due to mental illness, lacks sufficient
> mental capacity to be held morally responsible for his
> actions cannot be found guilty of a crime."

(continued. . .)

expressly testify that he determined in Sylva's case, there was merely a "very superficial" reason for the killing – that

> the basic reason is he's got a mission . . . to rid the world of demons . . . . This was obviously, in his delusional mind, a dangerous demon, and for some reason, . . . he's been anointed by what he reads in the Bible to take care of this problem.

More importantly, because the jury was precluded from considering Dr. Blinder's answer explaining the basis for his opinion, the jury may have placed less weight on his opinion, which was pivotal to Sylva's insanity defense. Additionally, in contrast to Dr. Blinder, Dr. Choi testified his opinion was partly based on the verbal dispute between Cerezo and Sylva on the bus; Dr. Choi testified that Sylva engaged in intentional and goal-oriented behavior, indicating no substantial impairment, because Sylva wanted to teach Cerezo a lesson after Cerezo provoked Sylva on the bus. There is a reasonable possibility that the circuit court's erroneous instruction to disregard Dr. Blinder's contrary testimony that there was only a "very superficial" reason for Sylva to kill Cerezo apart from his mental disorder might have contributed to Sylva's conviction. See Aplaca, 96 Hawai'i at 25, 25 P.3d at 800.

---

(. . . continued)

Abion, 148 Hawai'i at 458, 478 P.3d at 283 (quoting State v. Glenn, 148 Hawai'i 112, 116, 468 P.3d 126, 130 (2020)) (holding the circuit court's wholesale preclusion of a medical examiner from testifying at trial violated the defendant's constitutional right to present a complete defense).

This is not a case where there was a "wealth of overwhelming and compelling evidence tending to show" Sylva was guilty beyond a reasonable doubt, for there was substantial evidence to support Sylva's insanity defense.  See Veikoso, 126 Hawai'i at 276, 270 P.3d at 1006.  The record shows voluminous evidence supporting Sylva's mental disorder, including references to demons and aliens, as well as evidence that Sylva believed Cerezo was a demon.  All three examiners agreed that Sylva suffered from a mental disease, disorder, or defect at the time of the conduct, and two of the three opined that as a result, Sylva lacked capacity at the time of the conduct.

Because the insanity defense in this case turned largely on the three medical examiners' testimonies, the striking of parts of Dr. Blinder's explanation for his opinion was not harmless beyond a reasonable doubt.  See, e.g., DeLeon, 131 Hawai'i at 486, 319 P.3d at 405 (holding that because the defendant's "defense depended heavily on" the decedent's "behavior immediately before [the defendant] shot him, there [was] a reasonable possibility that the exclusion of" the expert's testimony about the influence of substances on the decedent's behavior "affected the outcome of the trial"); Gano, 92 Hawai'i at 176-77, 988 P.2d at 1168-69 (holding there was "more than a reasonable possibility" that the erroneous admission of evidence that contributed to the complainant's credibility and weighed

against the defendant's credibility contributed to the defendant's conviction).

The State contends that even if the circuit court erred, Sylva waived this argument. The State alleges Sylva waived any argument based on the circuit court's striking of Dr. Blinder's testimony because Sylva did not then raise an objection to the circuit court's directive to the jury to disregard Dr. Blinder's "last response." The State is simply wrong. Sylva had no duty to "object" to the court's sustaining of an objection.[15]

---

[15]    HRE Rule 103 (2016) provides in relevant part:

> **Rule 103. Rulings on evidence.** (a) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and:
>
>> (1) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context; or
>>
>> (2) Offer of proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.
>
> Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal.

This was not a ruling admitting evidence under HRE Rule 103(a)(1). It was a ruling excluding evidence under HRE Rule 103(a)(2), which would have required an offer of proof if "the substance of the evidence" was unknown. Here, the evidence stricken was clearly known. And pursuant to the rule, once the circuit court made its definitive ruling striking the evidence, Sylva was not required to renew an objection or present an offer of proof to preserve the issue for appeal. See generally Kobashigawa v. Silva, 129 Hawai'i 313, 300 P.3d 579 (2013).

28

Sylva has demonstrated error and the State has not demonstrated the error was harmless beyond a reasonable doubt. See Aplaca, 96 Hawai'i at 25, 25 P.3d at 800. We therefore vacate Sylva's conviction on these grounds.

**B. The circuit court properly instructed the jury on the application of the insanity defense to manslaughter based on EMED**

Sylva also contends the ICA gravely erred in concluding the circuit court did not erroneously fail to instruct the jury that if it found Sylva guilty of manslaughter based on EMED, it must then consider the insanity defense. We hold the circuit court properly instructed the jury on the application of the insanity defense to manslaughter based on EMED.

HRS § 707-702(2) (2014)[16] provides for the affirmative defense of EMED. EMED is referred to as a "mitigating" defense because where a defendant establishes the elements of EMED by a preponderance of the evidence, first- and second-degree murder or attempted murder offenses are reduced to manslaughter or

---

[16]    HRS § 707-702(2) provided:

> In a prosecution for murder or attempted murder in the first and second degrees it is an affirmative defense, which reduces the offense to manslaughter or attempted manslaughter, that the defendant was, at the time the defendant caused the death of the other person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. The reasonableness of the explanation shall be determined from the viewpoint of a reasonable person in the circumstances as the defendant believed them to be.

attempted manslaughter.  See HRS §§ 707-702(2), 701-115 (2014) (defining affirmative defenses and the requisite burden of proof); State v. Aganon, 97 Hawai'i 299, 302, 36 P.3d 1269, 1272 (2001) (referring to EMED as a "mitigating defense").

HRS § 704-400 lays out the insanity defense.  It provides in relevant part that

> [a] person is not responsible, under this Code, for conduct if at the time of the conduct as a result of physical or mental disease, disorder, or defect the person lacks substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform the person's conduct to the requirements of law.

HRS § 704-400(1).  If a defendant proves insanity by a preponderance of the evidence, they are entitled to acquittal. See id. §§ 701-115, 704-400(1), 704-402(1) (2014) (providing that insanity is an affirmative defense).

Sylva does not contend the jury instructions on the insanity defense contained incorrect statements of law.  Rather, Sylva's challenge relates to the order in which the circuit court instructed the jury to consider the affirmative defenses of insanity and EMED.

We have recognized that "a correct statement of the law does not always reflect an appropriate jury instruction in every case."  State v. Uyesugi, 100 Hawai'i 442, 457, 60 P.3d 843, 858 (2002) (citation omitted).  The question still remains whether, "when considered as a whole, the instructions given are

30

prejudicially insufficient, inconsistent, or misleading." Id. (citing Aganon, 97 Hawai'i at 302, 36 P.3d at 1272).

We have not previously decided the order in which a jury should be instructed to consider the insanity and EMED defenses.[17]

In concurrences in Yamada, 99 Hawai'i 542, 57 P.3d 467, and Uyesugi, 100 Hawai'i 442, 60 P.3d 843, Justice Acoba opined as to his belief regarding the proper order of the insanity and EMED jury instructions: "'[T]he jury was required to decide the insanity defense which would exclude responsibility for first degree murder, before proceeding to consider the mitigating defense of manslaughter,' inasmuch as the insanity defense completely negates guilt, while the emotional disturbance defense only mitigates guilt." Uyesugi, 100 Hawai'i at 473, 60 P.3d at 874 (Acoba, J., concurring) (quoting Yamada, 99 Hawai'i at 561, 57 P.3d at 486 (Acoba, J., concurring)).

_____

[17] In State v. Miyashiro, 90 Hawai'i 489, 979 P.2d 85 (App. 1999), the ICA held a trial court must instruct the jury that it is required to "unanimously agree that all elements of the charged offenses ha[ve] been established beyond a reasonable doubt before considering" an affirmative defense. 90 Hawai'i at 500, 979 P.2d at 96; see also Uyesugi, 100 Hawai'i at 459, 60 P.3d at 860 ("The Miyashiro analysis is correct."). Miyashiro did not involve a mitigating defense. See 90 Hawai'i at 500, 979 P.2d at 96. But "Miyashiro indicated that the instructions should be given in a sequence consistent with the logical progression of determining acquittal or guilt." State v. Yamada, 99 Hawai'i 542, 558, 57 P.3d 467, 483 (2002) (Acoba, J., concurring).

Justice Acoba's concurrence in <u>Yamada</u> relied in part on a New York case, <u>People v. Johns</u>, 122 A.D.2d 74 (N.Y. App. Div. 1986). <u>See</u> <u>Yamada</u>, 99 Hawai'i at 561, 57 P.3d at 486 (citing <u>Johns</u>, 122 A.D.2d 74). In <u>Johns</u>, the New York Supreme Court, Appellate Division, reversed the trial court's judgment convicting the defendant of manslaughter based on extreme emotional disturbance. 122 A.D.2d at 76. The defendant had raised the defenses of insanity and extreme emotional disturbance under applicable state law. 122 A.D.2d at 75. In that case, the trial court charged the jury as follows:

> [I]f the People had proven intentional murder beyond a reasonable doubt, the jury was then to consider the affirmative defense of extreme emotional disturbance. The court further instructed the jury that if it found that the defendant suffered from an extreme emotional disturbance, it should report its verdict of guilty of manslaughter in the first degree by reason of extreme emotional disturbance. If the jury found the defendant guilty of intentional murder, not mitigated by extreme emotional disturbance, it was to consider the defense of mental disease or defect, known as the insanity defense.

122 A.D.2d at 75-76.

On review, the appellate court concluded the trial court's jury instructions, though not objected to, improperly "created the misleading impression that the insanity defense did not apply if the jury found that the defendant satisfied his burden of proving that he was acting while under the influence of an extreme emotional disturbance." 122 A.D.2d at 76 (citation omitted). The appellate court noted the extreme emotional disturbance instruction "made no reference to the insanity

32

defense" and determined the trial court thus "impermissibly curtailed the jury's consideration of the insanity defense." Id.

In contrast, here, the circuit court instructed the jury to consider the insanity defense if the State established all the elements of the offense, and to only consider EMED if it unanimously found the insanity defense did not apply. In other words, the circuit court expressly instructed the jury to consider the insanity defense before EMED; the jury was to consider insanity regardless of whether EMED applied.

Unlike in Johns, the EMED instruction here expressly referenced the insanity defense. The beginning of the EMED instruction, instruction no. 26, stated,

> If and only if you unanimously find that all of the material elements of Murder in the Second Degree have been proven by the prosecution beyond a reasonable doubt, or you unanimously find that all of the material elements of the included offense of Manslaughter have been proven by the prosecution beyond a reasonable doubt, and you unanimously find that the defendant has not proven the elements of the affirmative defense of physical or mental disease, disorder or defect excluding criminal responsibility by a preponderance of the evidence, then you must consider the affirmative defense of Extreme Mental or Emotional Disturbance.

(Emphases added.) Because the circuit court expressly instructed the jury to consider insanity before EMED, it is unlikely that the instructions misled the jurors into believing they were not to consider the insanity defense for manslaughter based on EMED.

33

We agree with Justice Acoba's concurrences in Yamada and Uyesugi regarding the proper order of the jury instructions on the insanity and EMED affirmative defenses. See Yamada, 99 Hawai'i at 561, 57 P.3d at 486; Uyesugi, 100 Hawai'i at 473, 60 P.3d at 874. If the jury had accepted the insanity defense, it would have been required to acquit Sylva, and the EMED mitigating defense would have been inapplicable. Hence, the circuit court properly instructed the jury to consider the insanity defense before EMED.

There is nothing in the record on appeal indicating those jury instructions were prejudicially insufficient, inconsistent, or misleading. See Uyesugi, 100 Hawai'i at 457, 60 P.3d at 858. Sylva did not meet his initial burden to prove error on this issue. See id.; DeLeon, 131 Hawai'i at 479, 319 P.3d at 398. Therefore, the ICA did not gravely err in affirming the circuit court as to those jury instructions.

## V.    Conclusion

Based on the circuit court's erroneous striking of parts of Dr. Blinder's testimony, we vacate the circuit court's January 24, 2020 judgment, conviction, and sentence; as well as the ICA's January 3, 2023 judgment on appeal, and we remand to the

circuit court for further proceedings consistent with this

opinion.[18]

William H. Jameson, Jr.
for petitioner

Richard B. Rost
for respondent

/s/ Mark E. Recktenwald

/s/ Sabrina S. McKenna

/s/ Todd W. Eddins

/s/ James S. Kawashima

/s/ Henry T. Nakamoto



---

[18]    We note that double jeopardy principles preclude Sylva from being retried for second-degree murder because Sylva's successful use of the EMED defense entitled him to an acquittal of the murder charge.  See U.S. Const. amend. V; Haw. Const. art. I, § 10; Whiting v. State, 88 Hawai'i 356, 360, 966 P.2d 1082, 1086 (1998) (holding double jeopardy principles barred reprosecution for second-degree murder because the defendant's successful use of the EMED defense entitled him to an acquittal of the second-degree murder charge); see also HRS § 701-115(2)(b) (establishing the burden of proof for affirmative defenses, which entitle defendants to an acquittal); HRS § 707-702(2) (laying out the affirmative defense of EMED).  The State may, however, retry Sylva for manslaughter.  See Whiting, 88 Hawai'i at 360-62, 966 P.2d at 1086-88 (noting that reprosecution for the offense of reckless manslaughter is the functional equivalent of a retrial for manslaughter based on EMED).